2006 OK CR 7

**Richard Norman ROJEM, Jr., Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. D–2003–860.**

Court of Criminal Appeals of Oklahoma.

Feb. 24, 2006.

Craig D. Corgan, James Bowen, Oklahoma Indigent Defense System, Norman, OK, counsels for appellant at trial.

Janet Chesley, Traci Quick, Capital Trial Division, Oklahoma Indigent Defense System, Norman, OK, counsels for appellant at trial and appeal.

Dennis Smith, District Attorney, Christopher Kelly, Assistant District Attorney, Stephanie Jones, Assistant District Attorney, Cordell, OK, counsels for the State at trial.

W.A. Drew Edmondson, Attorney General of Oklahoma, Seth S. Branham, Assistant Attorney General, Oklahoma City, OK, counsels for the State on appeal.

## OPINION

LUMPKIN, Vice–Presiding Judge.

¶ 1 Appellant Richard Norman Rojem,. Jr. was tried by jury in the District Court of Washita County, Case No. CRF–84–35, and convicted of Kidnapping, First–Degree Rape, and First–Degree Murder. He was sentenced to one thousand (1,000) years for the kidnapping and rape convictions and to death for his murder conviction. On appeal, this Court affirmed, and the U.S. Supreme Court denied certiorari. *Rojem v. State*, 1988 OK CR 57, 753 P.2d 359; *Rojem v. Oklahoma*, 488 U.S. 900, 109 S.Ct. 249, 102 L.Ed.2d 238 (1988).

¶ 2 Appellant then filed for post-conviction relief with the trial court, but his application was denied. We affirmed that decision in *Rojem v. State*, 1992 OK CR 20, 829 P.2d 683. The Supreme Court denied certiorari once again. *Rojem v. Oklahoma*, 506 U.S. 958, 113 S.Ct. 420, 121 L.Ed.2d 343 (1992).

¶ 3 Appellant filed a second post-conviction application with the trial court, which denied relief. On appeal, this Court affirmed. *Rojem v. State*, 1996 OK CR 47, 925 P.2d 70. Appellant then filed a petition for writ of habeas corpus with the U.S. District Court for the Western District of Oklahoma, which denied relief with respect to his convictions but found the trial court had committed instructional error by failing to tell the jury to weigh aggravating and mitigating evidence when deciding whether or not to impose the death penalty. The Court granted conditional relief from the death sentence, and the Tenth Circuit later affirmed that decision. *Rojem v. Gibson*, 245 F.3d 1130 (10th Cir. 2001).

¶ 4 Accordingly, Appellant was granted a resentencing proceeding, which took place in July of 2003. The jury again sentenced Appellant to death, finding the existence of four aggravating circumstances: (1) Appellant was previously convicted of a felony involving the use or threat of violence to the person; (2) the murder was especially heinous, atrocious or cruel; (3) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and (4) the existence of a probability that Appellant will commit criminal acts of violence that would constitute a continuing threat to society. Appellant now appeals from that decision.[1]

---

1. Appellant's Petition in Error was filed on January 14, 2004. His initial brief was filed on September 27, 2004. The State's brief was filed on January 11, 2005. The case was submitted on January 21, 2005, and Appellant filed a reply

## FACTS

¶ 5 The facts in this case have been thoroughly set forth in *Rojem v. State,* 1988 OK CR 57, 753 P.2d 359. We won't restate those facts here. Suffice it to say that the case involves the brutal kidnapping, rape, and stabbing death of seven-year old Layla Dawn Cummings, Appellant's former stepdaughter. Appellant was connected to the crimes through a "significant amount of circumstantial evidence." *Id.,* 1988 OK CR 57, ¶ 4, 753 P.2d at 362.

## PRETRIAL AND JURY SELECTION ISSUES

¶ 6 In proposition four, Appellant claims reversible error occurred when the trial court proceeded to trial without first resolving all discovery and evidentiary hearing issues. As a resentencing proceeding, Appellant admits matters of guilt or innocence "were not, in and of themselves, at issue." Nevertheless, he claims that, because Oklahoma's jury instructions define mitigating circumstances as factors that may lessen "moral culpability or blame" and because both sides were pursuing DNA testing of evidence in the case, the trial court should have required the State to turn that evidence over for testing.

¶ 7 The evidence in question consists of a group of hairs collected from the victim's nightgown and undergarments—hairs that were, supposedly, never before known or tested. Appellant claims an OSBI report concerning these hairs was issued on December 23, 2002, but was not turned over to the defense until April 7, 2003, three months before the resentencing proceeding. The report, we're told, indicated that seven hairs among this group of untested hairs had cellular material present on the root end that was suitable for nuclear DNA testing. Appellant thus claims the trial court violated *Brady v.*

*Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) by holding the resentencing proceeding without first requiring those hairs to be tested.

¶ 8 In bringing this claim, Appellants alleges these seven hairs were previously "unknown." However, it is difficult from this record to ascertain exactly when those hairs were first discovered. The crime occurred more than twenty (20) years ago, in July of 1984. Obviously, the victim's clothing has been part of the evidence in this case since that time and was presumably made available for inspection by both the State and the defense long ago.[2] Additionally, an April 25, 1985 OSBI report (superceding an October 19, 1984 version) was attached to Appellant's amended application for post-conviction relief, filed February 10, 1989, and it appears the report was originally turned over to defense counsel at Appellant's November 7, 1984 preliminary hearing.

¶ 9 The April 25, 1985 OSBI report listed the victim's nightgown and panties as items 35 and 36. Those items were listed separately from items 33 and 34, which were individual hairs taken from anal, thigh, and perineal areas.[3] Later, in the analysis of the nightgown and panties, the report listed four individual scalp hairs taken from those clothes that were "consistent with" hair samples taken from the victim.[4] No other hairs are mentioned in the report in connection with the nightgown and panties. Thus, we do not know whether the hairs were taken from the nightgown or panties or both. Moreover, while seven hairs were supposedly found to be suitable for nuclear DNA testing, we do not know how many total hairs were discovered.

¶ 10 Thus, Appellant's *Brady* claim rests upon two pieces of evidence that have been part of this case for more than twenty years and which his own attorneys have had access

---

brief on January 26, 2005. Oral argument was held on October 4, 2005.

2. It appears defense counsel in Appellant's original trial inspected the evidence on April 18, 1985. (May 2, 1985 Tr. at 34–37.)

3. In Appellant's original appeal, we discussed these nine "unusual" hairs, stating that the evi-

dence suggested the hairs had been planted on the victim in an attempt to lead investigators astray. *Rojem,* 1988 OK CR 57, ¶ 49, n. 5, 753 P.2d at 368–69.

4. This was hair comparison analysis of the type that has come under fire in recent years.

to and in fact previously inspected. Therefore, his claim that these hairs were "unknown" is somewhat tenuous.

¶ 11 Be that as it may, it appears someone took the initiative to look at these two items of evidence once again, probably in mid 2002,[5] thereby resulting in the sudden discovery of these not-so-new hairs. But the parties were unable to work together during the next year in order to ensure Appellant had those hairs tested prior to resentencing. Each side blames the other for this failure.

¶ 12 Assuming, *arguendo,* that the seven hairs were first discovered in late July of 2002, the record indicates the State is primarily to blame for the non-testing from that time forward. On July 26, 2002, Washita County District Judge Richard Darby granted Appellant leave to conduct DNA testing on the evidence in question, thereby confirming an earlier ruling made on November 27, 2001. Thereafter, on August 8, 2002, Judge Darby granted Appellant's oral motion for a continuance in regard to the approaching trial (over the State's objection) so the hairs from the victim's nightgown and undergarments could be tested. The hairs were to be sent from the Washita County Sheriff's Office to the OSBI so an expert could ascertain if DNA testing could be performed.

¶ 13 The OSBI reportedly received the hairs on September 16, 2002 and began its attempts to determine if the hairs were amenable to DNA testing. A scheduled October 3, 2002 status conference on this issue apparently never occurred, but the State informed the defense in December of 2002 that the OSBI report was forthcoming. The OSBI issued its report on December 23, 2002, but did not forward the same to defense counsel. Five months had now passed, and the hair evidence remained fully in the State's control.

¶ 14 A hearing was set for February 20, 2003, but was passed because Appellant had major surgery on February 17. The parties then met on March 27, 2003, but there is no indication the matter of testing was ever addressed. Thus, a total of eight months had passed, and testing still had not occurred.

¶ 15 The parties then met for a hearing on April 3, 2003 before Washita County District Judge Charles Goodwin, who eventually presided over the resentencing proceeding. Defense counsel indicated he had been waiting for "months and months to look at some of the evidence in this case" and that "there was an agreement and an order in this case that there were to be some hairs mounted and looked at by the OSBI to determine whether we could do further testing on those items." But counsel indicated the defense had never been provided with the OSBI report. The District Judge indicated this was to be a very narrow trial and the "issue of guilt or innocence isn't on the table." Defense counsel agreed, but argued that if the subject hairs did not match Appellant, but did match another male, "we think it goes directly to the issue of sentencing and punishment." The State agreed defense counsel had pursued the DNA testing "from the beginning" and that the OSBI had not always followed through with what had been requested. Nevertheless, the State argued that the parties should not even be talking about guilt innocence. The judge eventually ordered the OSBI report delivered to defense counsel by April 10, 2003 and delayed ruling on defense counsel's oral motion for continuance and other matters until April 17.

¶ 16 The OSBI report was finally delivered to defense counsel on April 7, 2003. This appears to be the first time defense counsel knew that seven hairs from the victim's nightgown and underwear were amenable to DNA testing.

¶ 17 Thereafter, defense counsel filed a motion for continuance on April 17, 2003, relying in part on the information disclosed in the OSBI report. The matter was argued before the district court that same day, and the continuance was granted so testing could be accomplished. Jury trial was moved to

---

5. See August 8, 2002 Tr. at 5. (Said transcript is mislabeled as August 8, 2003, but the court minute and docket sheet indicate this hearing occurred in August of 2002 and clearly before Appellant's July, 2003 trial. O.R. 1572, 2040.)

July 15, 2003, with discovery statements to be submitted one month in advance.[6]

¶ 18 During the next month, defense counsel went through the necessary steps in order to get indigent defense system approval and funding for the DNA testing. Also, counsel located a lab suitable for the testing. On May 15, 2003, defense counsel notified the Washita County D.A. by letter of his intention to test the hairs. The letter included a request for information on the procedure to accomplish testing. The District Attorney's office did not reply, but began contacting the OSBI. Thereafter, nearly three weeks passed before counsel followed up his letter with a phone call on June 4, 2003. According to defense counsel, the Assistant D.A. in charge of the case told him he had spoken to the OSBI on May 29, that the matter was being worked on, and that he would get back to defense counsel on the matter. When no information was received by mid June, defense counsel informed the State he would seek another continuance. A motion in that regard was filed on June 18, 2003. Therein, counsel informed the district court that his expert had indicated it would take at least a month to conduct testing. However, the trial was scheduled for less than a month away.

¶ 19 During the June 26, 2003 hearing on this motion, defense counsel informed the district court that the Assistant D.A. was *still waiting* on the OSBI to advise of arrangements that needed to be made to transfer those hairs to the defense expert. The Assistant D.A. did not deny this, but instead argued that testing could be completed after the resentencing proceeding. The trial judge thereafter denied the motion for continuance, stating, "I'm just simply not impressed that the defense has done anything other than drug their feet."

¶ 20 Testing had still not taken place when the trial began on July 15. Defense counsel renewed his motion for continuance, which the district court again denied, stating, "[t]he fact is that evidence has been known and could have been tested for a long, long time."

¶ 21 This statement is, so far as we can determine, only partially supported by the record. The evidence in this case had been collected and was known for more than two decades. Thus, all of the crime scene evidence could have *and should have* been thoroughly tested, by both sides, years ago. The fact that "new" hairs have only been recently discovered boggles the mind, and the defense must take partial responsibility for this blunder.

¶ 22 However, following the August 2002 "discovery" of the seven not-so-new hairs, the record indicates that the failure of testing was primarily due to the State. Any delay on the part of Appellant was due to surgery and waiting perhaps too long at times for the State to relay testing information. But the bottom line is the State *never* turned over the hairs to the defense, despite numerous requests and orders to do so, and the trial judge was wrong to pin the blame for this delay on defense counsel.

■ ¶ 23 Nevertheless, under the specific facts of the case, we find this issue does nor require relief, for the following reasons. First, this evidence was available and should have been discovered and tested years ago.

¶ 24 Second, this was a resentencing proceeding, not a full-blown capital trial. Appellant's guilt for the crime in question has been determined by a jury and affirmed on appeal. The hairs in question go more toward the issue of guilt/innocence than they do toward mitigation, that is, reducing Appellant's moral culpability or blame. While we would agree that matters of actual innocence are always relevant, Appellant has suffered no prejudice in his ability to bring matters of actual innocence before this Court.

¶ 25 Third, assuming *arguendo* that these hairs were from a. different donor than Appellant, which is a huge assumption, such evidence would not be *per se* exculpatory and would add little in the way of mitigation. The nightgown in question actually belonged to the victim's mother. Therefore, it would not be strange to find other hairs foreign to

---

6. At the hearing, defense counsel advised the Court of the numerous procedures he would have to go through in order to obtain indigent defense system approval, funding, and testing of the evidence, stating, "it's a very short time to get accomplished what we need to get done."

the victim or Appellant on that gown. The panties in question had been stuffed into the victim's mouth and were partially exposed to the ground at the scene of the crime. It is highly doubtful they would have received or retained a hair from the child's attacker. In addition, due to possible contamination by exposure to other conceivable contributing factors from the apartment from which she was abducted, the means of transportation away from that site, or in the plowed field where she was found, the relevance and weight of that evidence would be subject to question.

¶ 26 But most importantly, this claim is simply too speculative to grant relief. Another two years has now passed since Appellant's resentencing proceeding, and the subject hairs have still not been tested.[7] This added delay suggests that Appellant's counsel has been hesitant to follow through with DNA testing, which may very well be damning. As such, any claim of prejudice must fail.[8]

¶ 27 In proposition one, Appellant claims the trial court committed reversible error by improperly denying his challenge for cause against several prospective jurors, thus compelling Appellant to use peremptory challenges against said jurors and resulting in the empanelling of objectionable jurors in violation of the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Article II, Sections 7, 9, 19, and 20 of Oklahoma's Constitution. Appellant claims four separate jurors were challenged for cause, but in each case the trial judge improperly declined to dismiss the jurors. Appellant also claims the error was preserved as he expended all of his peremptory challenges, asked for additional peremptories, and identified two unacceptable jurors who sat on his jury as a result of the trial court's rulings on challenges. This claim has merit.

¶ 28 Prospective juror Gregory had strong ties to law enforcement and significant experience as a jailer. He was a police officer for ten years, with stints in Texas and Cordell, Oklahoma (the county seat of Washita County, where the trial took place). He was also a Washita County deputy jailer for five to six months. As a Cordell police officer, he reviewed cases with Washita County Assistant District Attorney Christopher Kelly, one of the prosecutors in this case. Gregory's brother was a U.S. Marshall. Plus, Gregory's *current* job was supervising twelve inmates from the Hobart Work Center for the city of Cordell. In that capacity, he admittedly acted in a supervisory role and made reports to the Hobart Work Center about the inmates' compliance with rules.

¶ 29 Additionally, when asked if he could be impartial, prospective juror Gregory qualified his response, saying he "could probably sit fairly," although he also admitted that "if I was in Mr. Rojem's place, I wouldn't want me up here." He then said it would be appropriate for him to be excused.

¶ 30 Defense counsel challenged prospective juror Gregory for cause on two separate occasions, but the trial judge summarily overruled both challenges. Defense counsel then used his first peremptory challenge to excuse this would-be juror. Later, defense counsel requested an additional peremptory due to the trial judge's ruling on prospective juror Gregory, but, curiously, the trial judge ruled defense counsel had waived his ability to request additional peremptory challenges by failing to timely object.

■ ¶ 31 Under 38 O.S.2001, § 28(B)(4), jailers and law enforcement officers having custody of prisoners are not qualified to serve as jurors. Due to his job description and his employer's agency relationship with the Hobart Work Center—i.e., a municipality taking over supervision of inmates—it would be a stretch for this Court to take prospective juror Gregory outside the intent of this statutory provision.[9] Moreover, Gregory

---

7. Appellant's latest post-conviction application, filed June 27, 2005, which is as yet not part of this record, states that Appellant's post-conviction attorneys are still working to obtain DNA testing of the hairs in question.

8. During oral arguments on this issue, both sides were strongly encouraged to reach a resolution of this issue so that it does not forever remain an appellate issue.

9. This statutory provision was not cited as a basis for the cause challenge. However, the trial

should have been excused for actual bias under 22 O.S.2001, § 659(2), for he exhibited a "state of mind . . . in reference to the case, or to either party" that should have satisfied the court, "in the exercise of a sound discretion, that he cannot try the issue impartially, without prejudice to the substantial rights of the party challenging".

¶ 32 "Actual bias is present when a juror's views 'prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath.'" *Matthews v. State*, 2002 OK CR 16, ¶ 15, 45 P.3d 907, 915, n. 11; *Young v. State*, 1998 OK CR 62, ¶ 9, 992 P.2d 332, 337, *quoting Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). Trial judges enjoy broad discretion in deciding which members of the venire possess actual bias and should be excused for cause. *See Matthews*, 2002 OK CR 16, ¶ 16, 45 P.3d at 915. "However, in ruling on challenges for cause, all doubts regarding juror impartiality must be resolved in favor of the accused, who need not prove a juror's bias with unmistakable clarity." *Id.* Here, it cannot fairly be said that all doubts regarding the juror's impartiality were resolved in Appellant's favor.

¶ 33 Two other jurors should have also been dismissed for cause on defense counsel's challenge, but were not. Prospective juror Babeck knew Sheriff Joe Ferrero, a State's witness, from church. This would-be juror had read about the case and had discussed it with a coworker who served on the original jury. Their conversations had been extensive and "pretty intense" and had covered the evidence in the case. Babeck indicated he thought he could be fair, although he also admitted he did not know if he could put those discussions aside.

¶ 34 Prospective juror Braun knew Assistant District Attorney Christopher Kelly, one of the prosecutors, because Mr. Kelly had sent her husband to prison in a case where her young daughter was the victim. Needless to say, the instant case also involved a (former) stepfather who was convicted of victimizing a child.

¶ 35 Babeck and Braun should have been dismissed on the basis of actual bias, for we cannot say, under this record, that the trial judge acted within his discretion by overruling defense counsel's cause challenges. Prospective juror Babek was later dismissed from the panel with defense counsel's last peremptory challenge, but Ms. Braun sat as an alternate on the jury. The trial judge refused to grant additional peremptory challenges with respect to these jurors.

¶ 36 This brings us to the issue of prejudice. Any claim of jury partiality must focus on the jurors who ultimately sat. *Ross v. Oklahoma*, 487 U.S. 81, 86, 108 S.Ct. 2273, 2277, 101 L.Ed.2d 80 (1988). This is because the loss of peremptory challenges is "not of constitutional dimension." *Id.*, 487 U.S. at 88, 108 S.Ct. at 2278. Appellant must establish prejudice in order to get relief.

¶ 37 "On appeal, this Court will not grant relief based on the improper denial of a challenge for cause unless the record affirmatively shows that the erroneous ruling reduced the number of the appellant's peremptory challenges to his prejudice, and he must demonstrate that he was forced, over objection, to keep an unacceptable juror." *Matthews*, 2002 OK CR 16, ¶ 16, 45 P.3d at 915; *Warner v. State*, 2001 OK CR 11, ¶ 10, 29 P.3d 569, 573–74; *Powell v. State*, 1995 OK CR 37, 906 P.2d 765, 772; *Hawkins v. State*, 1986 OK CR 58, 717 P.2d 1156, 1158.[10]

---

court's summary denial preempted an adequate record on the reasons for the challenge or the reason for the denial.

10. The term "unacceptable juror" has, at times, been closely associated with the type of partiality that would cause a juror to be removed for cause. *See e.g., Grant v. State*, 2002 OK CR 36, ¶ 12, 58 P.3d 783, 790, *judgment vacated, Grant v. Oklahoma*, 540 U.S. 801, 124 S.Ct. 162, 157 L.Ed.2d 12 (2003). But it has also been construed to mean a juror who is "undesirable to his

position". *See e.g., Thompson v. State*, 1974 OK CR 15, 519 P.2d 538, 541; *Cook v. State*, 1982 OK CR 131, 650 P.2d 863, 868. The better road lies between these two extremes. For a criminal defendant will almost always be able to argue that a juror was somehow undesirable to the defendant's position, but to require that partiality to rise to the level of a cause challenge would render the statutory protection of the preemptive challenge virtually meaningless.

¶ 38 Juror Braun did not participate in jury deliberations, so we find her presence did not impact this trial in a meaningful way or render the trial unfair. But the failure to sustain cause challenges to Gregory, Babek, and Braun reduced Appellant's peremptory challenges by three. Appellant points to two other jurors who sat on his case, claiming they were unacceptable. Those were jurors Schantz and Putnam. The record is wholly inadequate to support that position as to Juror Schantz, however, and defense counsel failed to make her juror's questionnaire included in the record as an exhibit. However, the record adequately supports Appellant's claim as to Juror Putnam.[11]

¶ 39 Appellant was thus denied a statutory right granted under Oklahoma law when the trial court refused to dismiss three jurors for cause, resulting in prejudice when he was forced, over objection, to keep an unacceptable juror.

### *TRIAL ISSUES*

¶ 40 In proposition two, Appellant claims the trial court erred by disallowing two witnesses in support of his capital defense because Appellant's lawyers missed a discovery deadline. Appellant claims the trial court's actions violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Article II, Sections 7, 9, and 20 of Oklahoma's Constitution.

¶ 41 Three months before the resentencing trial was to begin, District Court Judge Charles Goodwin expressed his position at a motion hearing that pretrial discovery statements often triggered additional issues between litigants. Accordingly, he informed the parties that discovery statements were to be exchanged thirty days before trial.

¶ 42 Appellant, however, failed to meet this deadline with respect to two witnesses. Instead, Appellant mailed his notice of additional witnesses to the State on July 2, 2003, and the same was received the next day. This was twelve days prior to trial, i.e., past the trial judge's deadline but within the time allowed for completing all issues relating to discovery set forth in the Criminal Discovery Code. *See* 22 O.S.Supp.2002, § 2002(D) ("All issues relating to discovery, except as otherwise provided, will be completed at least ten (10) days prior to trial. The court may specify the time, place and manner of making the discovery and may prescribe such terms and conditions as are just.")

¶ 43 When the defense offered the two witnesses at trial, the State objected due to noncompliance with the thirty-day discovery deadline. The State then asked for the harshest available sanction under our code, i.e., an order excluding the testimony of both witnesses. *See* 22 O.S.Supp.2002, § 2002(E) (available sanctions include an order to permit discovery, the granting of a continuance, or prohibiting a party from introducing evidence not disclosed).

¶ 44 In response, defense counsel argued they had complied with the discovery code, had provided notice as soon as they knew the witnesses would testify, and that this Court advises against complete exclusion of witnesses for discovery violations that are not willful and motivated to obtain a tactical advantage. Nevertheless, the trial judge, without asking the State's attorneys if they had visited with the witnesses in the twelve days before trial, issued a ruling disallowing those witnesses from testifying. This was an abuse of discretion under the facts of this case and our Criminal Discovery Code.

¶ 45 The working presumption of Section 2002(D) of our Discovery Code is that adversaries can reasonably expect discovery matters to be continuing in the final weeks leading up to trial, even up to ten days before the trial begins.[12] Indeed, the trial judge's initial

---

11. Putnam performed data entry for the Cordell Police Department, her brother was a police officer, she had read about the case, knew witness Ferrero through her parents, her mother had made a remark to her about the case, and she was concerned about the financial impact the trial would have on her.

12. By the same token, discovery matters occurring after that ten-day window, i.e., within the ten days prior to trial, are presumptively unreasonable, putting the opposite side at a tactical disadvantage as they are preparing for trial. Of course, we approach such presumptions on a case-by-case basis.

deadline was based upon the understanding that discovery statements often triggered additional discovery issues. Thus, one party's disclosures may signal the other side to locate rebuttal witnesses or expert testimony to refute what the opponent has disclosed.

¶ 46 The trial judge therefore utilized excellent trial management skills when he ordered the parties to trade discovery statements thirty days before trial. Indeed, our Code gives trial courts discretion to specify the time, place, and manner of making the discovery. However, the trial judge acted beyond that discretion when he completely excluded defense witnesses as a sanction for noncompliance with those deadlines. We're concerned about giving opponents fair notice, not setting up and managing a system of elaborate trial penalties.

¶ 47 We dealt with similar issues in *White v. State,* 1998 OK CR 69, 973 P.2d 306. There, the defense committed an unintentional discovery code violation by failing to provide a report to the State of an expert scheduled to testify regarding the defendant's mental state. The district court had prohibited the expert from testifying because a report had not been provided to the State (even though no report had ever been generated) and because the testimony would invade the province of the jury. This Court found that the testimony was proper and the prescribed sanction was too harsh, holding as follows:

> The right of the accused to confront the prosecution's witnesses and to present his own witnesses to establish a defense is a fundamental element of due process of law. *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). Although the criminal discovery code provides for exclusion of evidence as a sanction for non-compliance, this Court has found in several capital cases that the exclusion of a defense witness was "too severe a sanction." *See Allen v. State,* 1997 OK CR 44, ¶ 11, 944 P.2d 934, 937. *See also Wisdom v. State,* 1996 OK CR 22, ¶ 44, 918 P.2d 384, 396; *Morgan v. District Court of Woodward County,* 1992 OK CR 29, ¶ 8, 831 P.2d 1001, 1005. In so finding the *Allen* court noted the Sixth Amend-

ment Compulsory Process Clause could be violated by excluding a material defense witness as a sanction for a discovery violation. *Allen,* 1997 OK CR 44, ¶ 11, 944 P.2d at 937. "Excluding a material defense witness is appropriate only where the discovery violation is 'willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence.'" *Id.* (quoting *Taylor v. Illinois,* 484 U.S. 400, 415, 108 S.Ct. 646, 656, 98 L.Ed.2d 798 (1988)). Where the discovery violation is not willful, blatant or calculated gamesmanship, alternative sanctions are adequate and appropriate. *See Allen,* 1997 OK CR 44, ¶ 11, 944 P.2d at 937.

*White,* 1998 OK CR 69, ¶ 12, 973 P.2d at 311.

¶ 48 Unlike *White,* defense counsel in the present case committed no discovery code violation. They provided the discovery statement within the time ordered by the judge, and then fulfilled their continuing duty to disclose by informing the State of two additional witnesses twelve days prior to trial. This was adequate notice under Section 2002(D)'s ten-day rule. Moreover, one of the witnesses had interviewed Appellant on July 11, 2003, just four days before trial. A report was generated in response to that interview and was turned over to the State. We find no violation of the trial judge's thirty-day order. Additionally we find no willful actions on the part of the defense that were designed to gain a tactical advantage.

¶ 49 The question, then, is whether the trial court's error requires reversal. While the exclusion of the first witness may be said to have been harmless, as her proposed testimony was fairly cumulative to other testimony from defense witnesses, the exclusion of Joy Hadwiger's testimony was prejudicial. Ms. Hadwiger—a former warden with more than six years experience as a warden, twenty years experience in prison administration, a Master's Degree in Corrections, teaching experience at Oklahoma State University in Introduction to Sociology, and currently pursuing continuing education in the areas of sociology and counseling psychology—was prepared to testify regarding

Appellant's education, employment opportunities, family, religious beliefs, and institutional adjustment. Her report, proffered as an offer of proof, indicates she would have testified that Appellant does not constitute a threat to those in the correctional facility where he is housed. These issues go directly to mitigation and the continuing threat aggravator alleged by the State. Therefore, we find Appellant's right to due process was violated.[13]

¶ 50 In proposition three, Appellant claims the trial court erroneously precluded him from presenting evidence and argument or even mentioning any matters pertaining to "residual doubt" as a mitigating circumstance, thereby frustrating his right to present a capital defense and violating his rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Article II, Sections 7, 9, and 20 of Oklahoma's Constitution. Due to the relief granted with respect to propositions one and two, we need not resolve whether or not Appellant was denied that right here.

¶ 51 However, for purposes of Appellant's new resentencing proceeding, we will give guidance for the benefit of the retrial procedure. The Supreme Court has expressed sincere doubts, albeit in a plurality opinion, that the constitution requires a jury instruction in a capital sentencing trial to cover the issue of residual or lingering doubt as a possible mitigating factor. *Franklin v. Lynaugh*, 487 U.S. 164, 172–74, 108 S.Ct. 2320, 2327, 101 L.Ed.2d 155 (1988).[14] More recently, however, the Court alluded to a defendant's use of residual doubt as mitigation and a viable capital sentencing strategy, as it discussed the application of the *Strickland v. Washington* standard for evaluating ineffec-

tive assistance of counsel in an original trial on the merits. *See Rompilla v. Beard,* —— U.S. ——, 125 S.Ct. 2456, 2460–67, 162 L.Ed.2d 360 (2005).

¶ 52 This Court has taken the position that the constitution does not require a jury instruction on residual doubt,[15] but we have also allowed that issue to be considered in jury instructions. *Powell v. State,* 2000 OK CR 5, ¶ 170, 995 P.2d 510, 542; *Cummings v. State,* 1998 OK CR 45, ¶ 61, 968 P.2d 821, 838.

¶ 53 But resentencing proceedings are unique, as the original jurors who personally listened to the first stage testimony and directly reviewed the evidence of guilt/innocence have been replaced with new jurors who are wholly unfamiliar with that evidence. Thus, any lingering doubts that existed are gone, for all intents and purposes.

¶ 54 Nevertheless, our capital resentencing statutes provide that "[a]ll exhibits and a transcript of all testimony and other evidence properly admitted in the prior trial and sentencing shall be admissible in the new sentencing proceeding". 21 O.S.2001, § 701.10a. To a certain extent, then, jurors are reintroduced to initial evidence and its strength.

¶ 55 And yet, resentencing jurors are initially instructed that the issue of guilt has already been decided and they are to accept that verdict and render a decision on sentence based on the law and evidence. It would be inconsistent and confusing to first tell jurors to accept the guilty verdict and then later specifically tell them to consider residual doubt as mitigation.

¶ 56 Accordingly, we find it improper for the issue of residual doubt to make its

---

13. Unfortunately, the trial judge's preemptive ruling did not allow for a decent record concerning this issue, i.e., whether the State had contacted Ms. Hadwiger in the days after receiving notice, whether the State had time to interview her as the trial progressed, whether the State would agree to a continuance, and whether or not Ms. Hadwiger was qualified to give expert opinion under *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), as adopted by this Court in *Taylor v. State,* 1995 OK CR 10, ¶ 15, 889 P.2d 319, 328–29.

14. The parties quarrel over whether or not this issue was dicta in the opinion. A close reading of the case indicates the Supreme Court left this issue, i.e., whether an instruction on residual doubt was constitutionally required, somewhat open. The majority found it was a "questionable proposition", while Justice O'Connor's concurring opinion found such lingering doubts did not fall under the concept of mitigating circumstances.

15. *Bernay v. State,* 1999 OK CR 37, ¶ 50, 989 P.2d 998, 1012.

way into a capital resentencing proceeding to the extent Appellant argues here.[16] As this Court held in *Bernay,* evidence relating to residual doubt is "not relevant to the defendant's character, record, or any circumstance of the offense." Of course, jurors in a resentencing proceeding will always be able to consider the weight of the evidence in deciding punishment. However, resentencing proceedings should not be viewed as a second chance at revisiting the issue of guilt. We will trust trial judges to use caution in exercising their discretion on this issue.

## JURY INSTRUCTIONS

 ¶ 57 In proposition seven, Appellant claims the jury instructions on the issue of mitigation impermissibly limited the definition of mitigating evidence and seriously diminished the effect of the mitigating evidence presented in the case and, as a result, the instruction violated Appellant's rights under the Eighth and Fourteenth Amendments of the U.S. Constitution and Article II, Sections 7 and 9 of Oklahoma's Constitution. Appellant specifically highlights a portion of OUJI–CR (2d) 4–78, which states that mitigating circumstances are those which "in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame." Appellant offered his own instruction on the meaning of mitigating evidence, which the trial court ultimately rejected.

¶ 58 This particular instruction has been analyzed by this Court on numerous occasions and found to be constitutional in response to similar arguments. *See Fitzgerald v. State,* 2002 OK CR 31, ¶ 17, 61 P.3d 901, 905; *Williams v. State,* 2001 OK CR 9, ¶ 109, 22 P.3d 702, 727–28; *Patton v. State,* 1998 OK CR 66, ¶ 99, 973 P.2d 270, 298; *Johnson v. State,* 1996 OK CR 36, ¶ 31, 928 P.2d 309, 317, *cert. denied,* 522 U.S. 832, 118 S.Ct. 99, 139 L.Ed.2d 54 (1997). Given the additional wording of this instruction, which allowed jurors to determine what circumstances were mitigating under the facts and evidence of the case, along with several other instructions on mitigating circumstances, we find the jury was adequately instructed under the law, and no constitutional error occurred.

¶ 59 In proposition nine, Appellant claims his rights to due process and trial by jury were violated by the trial court's failure to instruct the jury that the death penalty could not be imposed unless the jury first found that aggravation outweighed mitigation beyond a reasonable doubt. This argument is based on the indigent defense system's oft-raised interpretation of *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999).

¶ 60 But as Appellant's brief admits, this Court has repeatedly rejected this claim. *Davis v. State,* 2004 OK CR 36, ¶ 45, 103 P.3d 70; *Torres v. State,* 2002 OK CR 35, ¶ 6, 58 P.3d 214, 215; *Murphy v. State,* 2002 OK CR 32, ¶¶ 22–25, 54 P.3d 556, 565. We find these cases effectively resolve the issue raised.

## ISSUES PERTAINING TO AGGRAVATING CIRCUMSTANCES

 ¶ 61 In proposition five, Appellant claims the State failed to present sufficient facts to support the continuing threat aggravator alleged. More specifically, Appellant claims the only evidence the State presented in order to support this aggravator was the instant crime and Appellant's two prior convictions for rape, which were obtained in Michigan in 1979. Meanwhile, Appellant put on evidence of good behavior during his time on death row. He claims this is insufficient to show "at the present time there exists a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society", as required by the jury instructions. As a result, Appel-

---

**16.** Interestingly, it does not appear as though counsel for either side sought to readmit the transcripts and evidence from the first trial as resentencing exhibits. And so, the background context for arguing residual doubt was not present. Moreover, Appellant's claim that he was completely denied the opportunity to raise this issue during resentencing is somewhat exaggerated as the trial judge allowed the defense to put on evidence that male DNA found under the victim's fingernails did not match Appellant.

lant claims the jury's findings of the existence of the aggravating circumstance is invalid under the Eighth and Fourteenth Amendments to the United States Constitution as well as Article II, Sections 9 and 20 of Oklahoma's Constitution.

¶ 62 The State, on the other hand, claims "overwhelming" evidence was presented to establish Appellant represents a continuing threat to society. The State points to the callous nature of the instant crime, and Appellant's acts of kidnapping and raping two Michigan women at knifepoint (one of whom received a severe beating). Additionally, the State notes that Appellant was cited for violations three times while on death row, one of which involved a battery to another inmate. (These violations are more than a decade old, however.) The State also argues that this Court already upheld the continuing threat aggravating circumstance on this same evidence in Appellant's first appeal. *Rojem*, 1988 OK CR 57, ¶ 56, 753 P.2d at 370. And finally, the State correctly notes Appellant has very little opportunity to engage in misconduct as prison security for those on death row involves minimal contact.

¶ 63 This Court will uphold the jury's finding on the continuing threat aggravating circumstance "if, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could find the charged aggravating circumstance beyond a reasonable doubt." *Malicoat v. State*, 2000 OK CR 1, ¶ 16, 992 P.2d 383, 397. Using that standard of review, we find the evidence introduced was sufficient to support the jury's finding.

¶ 64 In proposition six, Appellant claims the jury's findings of the aggravating circumstance of "prior violent felony" and "continuing threat" violated the Eighth and Fourteenth Amendments because the aggravators were duplicative and cumulative. Appellant claims the evidence was used to support both of these aggravators, thus condemning him twice for the same actions. He claims the overlapping of the two aggravators erroneously covered the same aspect of his criminal history, as prohibited by *Green v. State*, 1985 OK CR 126, ¶ 26, 713 P.2d 1032, 1040. All distinctions were lost,

he argues, and one aggravator was subsumed by the other.

¶ 65 This Court has previously addressed and rejected this claim because the evidence of prior convictions to support these two aggravating circumstances does not "show the same aspect of appellant or his crime." *Fitzgerald v. State*, 2002 OK CR 31, ¶ 16, 61 P.3d 901, 905; *Smith v. State*, 1991 OK CR 100, 819 P.2d 270, 278, *cert. denied*, 504 U.S. 959, 112 S.Ct. 2312, 119 L.Ed.2d 232 (1992). This evidence, used to support the continuing threat aggravator, showed the typical scheme Appellant used to kidnap and rape young girls. When considered with the instant crime, the evidence shows a sexual predator at work, one who would likely strike again. This evidence, used to support the prior violent felony aggravator, showed a felon employing an escalating amount of violence in order to accomplish his twisted plans. No relief is warranted.

¶ 66 In proposition eight, Appellant claims the death sentence should be vacated or modified on grounds that aggravating circumstances were not charged in an information or indictment and were therefore not subjected to adversarial testing in a preliminary hearing or determined to probably exist by a neutral and detached magistrate. Thus, Appellant claims the District Court never acquired jurisdiction over them. His arguments are based, again, upon the U.S. Supreme Court's decisions in *Ring* and *Apprendi*.

¶ 67 However, we have recently rejected this same claim and find nothing in Appellant's brief to convince us that our prior decisions on this point were wrong. *See Davis v. State*, 2004 OK CR 36, ¶¶ 44–46, 103 P.3d 70, 83; *Thacker v. State*, 2004 OK CR 32, ¶¶ 9–22, 100 P.3d 1052, 1055, *cert. denied*, —— U.S. ——, 125 S.Ct. 1611, 161 L.Ed.2d 288 (2005); *Primeaux v. State*, 2004 OK CR 16, ¶¶ 14–16, 88 P.3d 893, 899–900, *cert. denied*, 543 U.S. 944, 125 S.Ct. 371, 160 L.Ed.2d 257 (2004).

¶ 68 In proposition ten, Appellant claims the heinous, atrocious, or cruel aggravating circumstance is unconstitutionally vague and overbroad as it is currently being applied in Oklahoma. He claims the jury instruction given failed to inform jurors "of

the requirement of finding inordinate conscious physical suffering." He relies, primarily, on amendments to OUJI–CR 4–73 that this Court approved in *DeRosa v. State,* 2004 OK CR 19, ¶ 96, 89 P.3d 1124, 1155. Appellant's trial took place before *DeRosa* was handed down, and thus the trial court used the former version of the uniform instruction, rejecting a version proffered by defense counsel.

¶ 69 Appellant argues it is an "inescapable" implication that the former version of the uniform instruction was inadequate, due to the new instruction adopted by the Court in *DeRosa* and references therein to *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). We disagree.

¶ 70 There is no doubt the amended instruction is an improvement over the former and takes a cautious approach toward the concerns addressed in *Ring.* As Appellant notes, the instruction is "intended to more fully inform the jury regarding the findings that must be made in order to properly apply the aggravator and to ensure that a jury determination is made regarding each of these findings." *DeRosa,* 2004 OK CR 19, ¶ 96, 89 P.3d 1124, 1155. That is, the instruction *more fully* informs and acts as a form of insurance.

¶ 71 But this does not mean the former instruction has suddenly become unconstitutional. Indeed, *DeRosa* plainly states it "should not be interpreted as a ruling that the former uniform instruction was legally inaccurate or inadequate … Hence cases in which the former instruction has been used and applied are not subject to reversal on this basis." *Id.,* 2004 OK CR 19, ¶ 97, 89 P.3d 1124, 1155.

¶ 72 We find these words have application here. The record in this case has an abundance of evidence indicating an extremely young victim's conscious physical suffering in a terrifying ordeal in the moments before her death. Indeed, during closing arguments relating to this aggravator, both sides addressed the evidence presented during trial and specifically related that evidence and the aggravator to the length of the victim's consciousness. It is virtually impossible under this record to separate the victim's murder from conscious physical suffering.

¶ 73 Moreover, this Court has rejected similar attacks upon the constitutionality of this aggravating circumstance. *See Thacker,* 2004 OK CR 32, ¶ 26, 100 P.3d at 1055; *Lockett v. State,* 2002 OK CR 30, ¶ 40, 53 P.3d 418, 430; *Le v. State,* 1997 OK CR 55, ¶¶ 41–45, 947 P.2d 535, 552–53, *cert. denied,* 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998). *See also Hooker v. State,* 1994 OK CR 75, ¶ 44, 887 P.2d 1351, 1364–65, *cert. denied,* 516 U.S. 858, 116 S.Ct. 164, 133 L.Ed.2d 106 (1995); *Revilla v. State,* 1994 OK CR 24, ¶ 42, 877 P.2d 1143, 1154–55, *cert. denied,* 513 U.S. 1096, 115 S.Ct. 764, 130 L.Ed.2d 661 (1995); *Berget v. State,* 1991 OK CR 121, ¶¶ 29–34, 824 P.2d 364, 372–74, *cert. denied,* 506 U.S. 841, 113 S.Ct. 124, 121 L.Ed.2d 79 (1992). In each of these cases we found the instruction given regarding the heinous, atrocious, or cruel aggravating circumstance sufficiently narrowed its application and passed constitutional muster.

¶ 74 In proposition eleven, Appellant claims the continuing threat aggravating circumstance is unconstitutionally vague and overbroad as construed and applied by this Court, and therefore in violation of the Eighth and Fourteenth Amendments. We have consistently rejected this argument, which is raised in most capital appeals. *See, e.g., Murphy v. State,* 2002 OK CR 24, ¶ 39, 47 P.3d 876, 884 ("the continuing threat aggravator is constitutionally applied in Oklahoma"), *cert. denied,* 538 U.S. 985, 123 S.Ct. 1795, 155 L.Ed.2d 678 (2003); *Williams v. State,* 2001 OK CR 9, ¶¶ 75–82, 22 P.3d 702, *cert. denied,* 534 U.S. 1092, 122 S.Ct. 836, 151 L.Ed.2d 716 (2002) (finding the applicable jury instruction is constitutional, not vague, and "a correct statement of the law"); *Wackerly v. State,* 2000 OK CR 15, ¶¶ 50–51, 12 P.3d 1, *cert. denied,* 532 U.S. 1028, 121 S.Ct. 1976, 149 L.Ed.2d 768 (2001) (finding the phrase "the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society" is clear and does not require further definition); *Rogers v. State,* 1995 OK CR 8, ¶ 40, 890 P.2d 959, *cert. denied,* 516 U.S. 919, 116 S.Ct. 312, 133 L.Ed.2d 215 (1995) (noting the Court has consistently rejected the notion that the aggravator is standardless or all-inclusive.) This proposition is denied.

*MANDATORY SENTENCE REVIEW*

¶ 75 In proposition twelve, Appellant claims the accumulation of error in his resentencing proceeding deprived him of due process of law and a reliable sentencing proceeding in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution and Article II, §§ 7 and 9 of Oklahoma's Constitution. We agree that the errors raised in propositions one and two resulted in the denial of due process of law. Considered together, these propositions require relief under the facts of this case.

## DECISION

¶ 76 Appellant's death sentence is hereby **REVERSED** and the matter is **REMANDED** to the District Court of Washita County for a new sentencing proceeding consistent herewith. Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2005), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

C. JOHNSON, A. JOHNSON, and LEWIS, JJ.: concur.

CHAPEL, P.J.: concur in result.