2010 OK CR 14

**Alfred Brian MITCHELL, Appellant**

v.

**STATE of Oklahoma, Appellee.**

No. D–2008–57.

Court of Criminal Appeals of Oklahoma.

July 1, 2010.

Mitch Solomon, Gina Walker, Assistant Public Defenders, Oklahoma City, OK, counsel for appellant at trial.

David Prater, District Attorney, Sandra Elliott, Suzanne Lister, Assistant District Attorneys, Oklahoma City, OK, counsel for the state at trial.

Andrea Digilio Miller, Assistant Public Defender, Oklahoma City, OK, counsel for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Robert Whittaker, Assistant Attorney General, Oklahoma City, OK, counsel for the State on appeal.

## OPINION

LUMPKIN, Judge.

¶ 1 Alfred Brian Mitchell, Appellant, was tried by a jury in June 1992 and convicted of First–Degree Malice Aforethought Murder, in violation of 21 O.S.1991, § 701.7; Robbery with a Dangerous Weapon, in violation of 21 O.S.1991, § 801; Larceny of an Automobile, in violation of 21 O.S.1991, § 1720; First–Degree Rape, in violation of 21 O.S.1991, §§ 1111, 1114; and Forcible Anal Sodomy, in violation of 21 O.S.1991, § 888; in the District Court of Oklahoma County, Case No. CF–91–206. In the sentencing phase, the jury recommended a death sentence for the murder after finding: 1) the murder was "especially heinous, atrocious, or cruel"; 2) the murder was "committed for the purpose of avoiding or preventing a lawful arrest or prosecution"; and 3) there was a "probability that [Appellant] would commit criminal acts of violence that would constitute a continuing threat to society." *See* 21 O.S.1991, § 701.12(4), (5) and (7), respectively. In accordance with the recommendations of the jury, the trial court sentenced Appellant to death for the murder and to imprisonment for a total of 170 years for the other felonies.

¶ 2 Appellant appealed to this Court, and we affirmed his convictions and his sentences. *Mitchell v. State*, 1994 OK CR 70, 884 P.2d 1186 (hereinafter referred to as *Mitchell I* ). This Court denied Appellant's petition for rehearing, and the United States Supreme Court denied his petition for certiorari. *Mitchell v. Oklahoma*, 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995). Appellant then sought post-conviction relief in this Court, which was denied. *Mitchell v. State*,

1997 OK CR 9, 934 P.2d 346 (hereinafter referred to as *Mitchell II* ). The Supreme Court again denied Appellant's petition for certiorari. *Mitchell v. Oklahoma*, 521 U.S. 1108, 117 S.Ct. 2489, 138 L.Ed.2d 996 (1997).

¶ 3 Appellant then pursued federal habeas corpus relief in the United States District Court for the Western District of Oklahoma. *Mitchell v. Ward*, 150 F.Supp.2d 1194 (W.D.Okla.1999). The federal district court granted habeas relief on Appellant's convictions for rape and sodomy, vacating those convictions but leaving his other convictions and sentences intact.

¶ 4 Appellant appealed to the United States Court of Appeals for the Tenth Circuit. In *Mitchell v. Gibson*, 262 F.3d 1036 (10th Cir.2001),[1] the Tenth Circuit upheld Appellant's first-degree murder conviction, but vacated his death sentence and ordered a new capital sentencing proceeding. Pursuant to 21 O.S.2001, § 701.10a, a new jury was impaneled for the resentencing trial, which was held October 21–31, 2002. This time the jury found two aggravating circumstances: 1) the murder was "especially heinous, atrocious, or cruel"; and 2) the murder was "committed for the purpose of avoiding or preventing a lawful arrest or prosecution." *See* 21 O.S.1991, § 701.12(4) and (5), respectively. The jury again recommended the death penalty, and the trial court so ordered. Appellant appealed to this Court. *Mitchell v. State*, 2006 OK CR 20, 136 P.3d 671 (hereinafter referred to as *Mitchell III* ). This Court reversed Appellant's death sentence and remanded the case to the District Court for resentencing.

¶ 5 A second re-sentencing trial was held on November 26—December 6, 2007. The jury found the existence of the aggravating circumstance "especially heinous, atrocious, or cruel" and recommended the sentence of death. See 21 O.S.1991, § 701.12(4). On January 16, 2008, the trial court sentenced Appellant in accordance with the jury's ver-

---

**1.** The State did not appeal the district court's grant of relief on the rape and sodomy convictions. *Id.* 262 F.3d at 144, n. 2. The robbery and larceny convictions were not addressed in

Appellant's habeas appeal and are therefore final adjudications that are not at issue. *Id.* at 1044, n. 1.

dict. From this judgment and sentence, Appellant appeals.[2]

¶ 6 The facts of this case were summarized in this Court's opinion on direct appeal, which is incorporated herein by reference. *See Mitchell I,* 1994 OK CR 70, ¶¶ 2–3, 884 P.2d at 1191–92. The evidence presented at the second re-sentencing trial was sufficiently the same as that presented at the first re-sentencing so that we may rely on the brief summary of facts set forth in our earlier opinion:

> Briefly stated, on January 7, 1991, Alfred Brian Mitchell found Elaine Scott alone at the Pilot Recreation Center in Oklahoma City. The evidence presented at the resentencing established that Mitchell first attacked Scott near the Center's library, where a spot of blood, one of Scott's earrings, and a sign that she had been hanging were later found on the floor. Scott apparently ran for the innermost room of the Center's staff offices—as she had told her mother she would if she ever found herself in a dangerous situation at the Center—where there was a phone and a door that she could lock behind her. She almost made it. Although the exact sequence of events is unclear, the State established that Scott's clothing was taken off and that a violent struggle ensued, in which Mitchell beat and battered Scott, using his fists, a compass, a golf club (which ended up in pieces), and a wooden coat rack. The forensic evidence—including the condition of Scott's nude, bruised, and bloodied body—established that she was moving throughout the attack, until the final crushing blows with the coat rack, which pierced her skull and ended her life.

2006 OK CR 20, ¶ 6, 136 P.3d at 676–677.

¶ 7 Appellant raises eighteen (18) propositions of error in this appeal. These propositions will be addressed in the order in which they arose at trial.

## JURY SELECTION

¶ 8 Appellant asserts in his fourth proposition of error that the trial court abused its discretion in denying the use of juror questionnaires and individual sequestered *voir dire*. Appellant argues that as he was denied the benefit of individual questioning, either through individual in person questioning or questionnaires, the jury selection process did not comport with due process and undermines the reliability of the capital sentence imposed.

¶ 9 In support of his claim, Appellant directs us to responses by three potential jurors during the court's initial questioning. Prospective Jurors R.M. and A.K. stated they remembered reading about Appellant's case in the newspapers. Prospective Juror R.L. stated his wife had been murdered, her murderer was on death row, and the process had been unpleasant for him. Appellant argues that if questionnaires or individual *voir dire* had been allowed the jury pool would not have been exposed to the highly inflammatory responses of the three potential jurors.

¶ 10 The manner and extent of *voir dire* is within the discretion of the trial court whose rulings will not be disturbed on appeal absent a clear abuse of discretion. *Eizember v. State,* 2007 OK CR 29, ¶ 67, 164 P.3d 208, 228. No abuse of discretion will be found so long as the *voir dire* is conducted in a manner which affords the defendant a jury free of outside influence, bias or personal interest. *Id.*

¶ 11 The purpose of *voir dire* examination is to ascertain whether there are grounds to challenge prospective jurors for either actual or implied bias and to facilitate the intelligent exercise of peremptory challenges. *Warner v. State,* 2006 OK CR 40, ¶ 15, 144 P.3d 838, 858. To that end, this Court has recently encouraged, but not mandated, the use of juror questionnaires. *See Eizember,* 2007 OK CR 29, ¶ 40, 164 P.3d at 221, n. 6.; *Jones v. State,* 2006 OK CR 17, ¶ 16, 134 P.3d 150, 156. Whether to conduct individual *voir dire* is within the trial court's discretion. *Eizember,* 2007 OK CR 29, ¶ 69, 164 P.3d at 228. Although a defendant may

**2.** Appellant's Petition in Error was filed in this Court on July 17, 2008. His brief was filed on February 24, 2009, and the State's brief was filed on July 31, 2009. Mitchell's reply brief was filed on August 27, 2009. Oral argument was held on December 8, 2009.

request individual *voir dire,* he has no automatic right to such a request. *Stouffer v. State,* 2006 OK CR 46, ¶ 12, 147 P.3d 245, 257. "Individual *voir dire* is appropriate where the record shows jurors were not candid in their responses about the death penalty, or that responses were tailored to avoid jury service." *Id.* quoting *Hanson v. State,* 2003 OK CR 12, ¶ 5, 72 P.3d 40, 46.

■ ¶ 12 Prospective Jurors R.M. and A.K. stated they remembered reading about Appellant's case in the newspapers approximately 16 or 17 years earlier. No details of what they remembered reading were given. Both stated they could set aside what they remembered reading and decide the case on the evidence presented at trial.

¶ 13 Because of the obvious difficulty in reviewing juror candidness, we must rely and place great weight upon the trial court's opinion of the jurors. *See Eizember,* 2007 OK CR 29, ¶ 41, 164 P.3d at 221 ("[d]eference must be paid to the trial judge who sees and hears the jurors", *quoting Wainwright v. Witt,* 469 U.S. 412, 425, 105 S.Ct. 844, 853, 83 L.Ed.2d 841 (1985)). Here, the trial court, who saw the prospective jurors and heard their responses firsthand, found no need to conduct individual *voir dire.* We find the record supports that conclusion as there is nothing in their responses that indicate the prospective jurors were anything less than candid.

■ ¶ 14 Prospective Juror R.L., after giving the previously cited testimony regarding the murder of his wife, and at the request of defense counsel, was sequestered from the remainder of the jury pool and individual *voir dire* was conducted. At the end of which, he was excused for cause. Appellant has failed to show how this prospective juror's statements about his personal experiences, bereft of any personal opinions, impacted the remainder of the jury pool.

¶ 15 A recurring theme in Appellant's challenges to jury selection is that he was not given enough information to intelligently exercise his peremptory challenges. He claims the jury selection process was conducted in an "expedient manner" and that prospective jurors were not told what the law requires, but asked if they could follow it nonetheless.

¶ 16 The record reflects a very thorough *voir dire* was conducted spanning two and half days. Prior to the start of questioning, prospective jurors were informed of their purpose—to decide punishment—and given the three possible punishments. The trial judge explained the Bill of Particulars, the role of aggravating circumstances and mitigating evidence, the State's burden of proof, the process involved in finding the existence of an aggravating circumstance, the weighing of that evidence against the mitigating evidence and the determining of the appropriate sentence. The judge indicated the jury would receive all of this information in written instructions at the close of the evidence. The judge further informed the prospective jurors that a juror needed to be fair and impartial, able to listen to all of the evidence, and consider all three possible punishments.

¶ 17 The record in this case shows that the trial court did not rush through *voir dire.* There is no indication in the record that defense counsel was prevented from asking any questions pertinent to exercising peremptory challenges. Appellant used all nine peremptory challenges. However, nowhere in the record or appellate brief does he request additional challenges or specify which sitting jurors he would excuse if given additional challenges. Based upon this record, we find the trial court did not abuse its discretion in refusing the requests for questionnaires and individual sequestered *voir dire.* This proposition of error is denied.

■ ¶ 18 In his fifth proposition of error, Appellant challenges the trial court's *sua sponte* removal for cause, over defense objections, of nine prospective jurors. Appellant asserts these removals were in violation of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) as the trial court failed to properly determine that these prospective jurors could not follow the law and consider all possible punishments.

■■ ¶ 19 The decision whether to disqualify a prospective juror for cause rests in the trial court's sound discretion. *Grant v. State,* 2009 OK CR 11, ¶ 24, 205 P.3d 1, 13.

The trial court's decision will not be overturned unless an abuse of discretion is shown. *Id.* Once again, we generally defer to the impressions of the trial court, which can better assess whether a potential juror would be unable to fulfill his or her oath. *Id.*

¶ 20 "This Court has repeatedly recognized that the standard for capital juror acceptability in Oklahoma is whether, in a case where the law and facts make a defendant eligible for the death penalty, each juror will be willing to *consider* each of the three authorized punishments: the death penalty, life imprisonment without the possibility of parole, and life imprisonment (with the possibility of parole)." *Mitchell III*, 2006 OK CR 20, ¶ 39, 136 P.3d at 688–89 (emphasis in original). This Court will look to the entirety of the juror's *voir dire* examination to determine if the trial court properly excused the juror for cause. *Eizember*, 2007 OK CR 29, ¶ 42, 164 P.3d at 222.

¶ 21 Prospective Juror F.F. initially told the court "it was kind of hard to say" whether he could give meaningful consideration to all three punishments. (Tr. Vol. I, pg. 66). Upon further questioning by the court, it became clear the potential juror's knowledge of facts in an unrelated upcoming criminal trial would affect his ability to listen to the case against Appellant and make a decision. Despite the court's decision to excuse the juror, defense counsel was granted additional *in-camera* questioning. As a result, the prospective juror said that because of his knowledge of the other case, he could not be fair to either side in Appellant's case. Over defense counsel's objection, the court excused the juror, stating "he's got something external affecting him ... it's something that affects him from something else that would affect his ability to give both sides a fair trial." (Tr. Vol. I, pg. 70).

¶ 22 When asked if she could consider all three possible punishments or "are you excluding one or the other", Prospective Juror P.M. replied, "I would have to exclude one of the three." P.M. said her answer was unequivocal, she had felt that way for "quite a while", and there was nothing the trial judge could say that would convince her to change her mind. (Tr. Vol. I, pgs. 71–72).

¶ 23 Despite the court's decision to excuse her, defense counsel was allowed to *voir dire* P.M. further. In response to defense counsel's questions, P.M. said the death penalty was the penalty option she was not able to give meaningful consideration. She indicated she understood when defense counsel told her that she was still entitled to be a juror if she was able to put that personal opinion aside and follow the instructions of the court, that the court would never tell her she had to return a death verdict and just because she might have religious scruples against the death penalty, she could still sit as a juror. When asked if she was "in a position to be able to set your beliefs aside and follow the instructions of the court and listen to the evidence", P.M. replied, "I am against the death penalty and I would never vote for anyone's life to be taken." (Tr. Vol. I, pgs. 73–74).

¶ 24 In making her record concerning the excusal of P.M., defense counsel complained in part that the defense was entitled to know which punishment option a juror could not consider. The trial judge agreed to include that inquiry in his questioning of the remaining veniremen.

¶ 25 Prospective Juror S.A. told the court she had a "serious" problem considering all three punishments, that she was against the death penalty in all circumstances and that she was unequivocal in her decision. (Tr. Vol. I, pgs. 81). The following colloquy then occurred:

THE COURT: Can you set that decision aside and render a verdict and decide the issues in this case based on the law and the evidence:

PROSPECTIVE JUROR S.A.: I can decide a verdict.

THE COURT: Pardon me?

PROSPECTIVE JUROR S.A.: Decide a verdict?

THE COURT: I'm sorry.

PROSPECTIVE JUROR S.A.: I'm sorry.

THE COURT: Okay, can you set aside your opinion and set it aside and not consider it any more and decide the issues in

this case or are you period, no death penalty, no matter what.

PROSPECTIVE JUROR S.A.: No matter what.

(Tr. Vol. I, pgs. 81–82).

¶ 26 Prospective Jurors N.B., K.D., K.B., and M.W. each said in turn that they could not give meaningful consideration to all three punishments, that they could not follow the court's instructions to consider all three punishments, and that their answers were unequivocal.

¶ 27 Prospective Juror J.W. said he could not give meaningful consideration to the death penalty and the life without parole option. He said there was no set of facts the court could give him that he could envision giving the death penalty or life without parole. J.W. said he was unequivocal in his determination that he could not consider those two punishment options, even if the court's instructions told him to give consideration to all three punishments.

¶ 28 Prospective Juror J.P. initially said he could not consider the death penalty because of religious scruples. Upon further questioning by the court, the prosecutor and defense counsel, the court found the juror had been equivocal in his answers regarding consideration of the death penalty. During an individual, sequestered *voir dire*, where he was questioned extensively by the court, the prosecutor and defense counsel, J.P. clarified his views and stated he could not consider all three punishments. In excluding J.P. for cause, the court noted that from observing him closely in chambers, J.P. was allowing matters outside the law and evidence, to influence his ability to consider to all three punishments.

¶ 29 As illustrated above, six of the challenged veniremen, N.B., K.D., K.B., M.W., J.W., and P.M. were unequivocal in their responses that they could not consider all

three punishments. Because these prospective jurors could not consider all of the punishments provided by law, they could not discharge their duties as jurors. Accordingly, we find no abuse of discretion in their removal for cause. *Grant*, 2009 OK CR 11, ¶ 25, 205 P.3d at 13; *Patton v. State*, 1998 OK CR 66, ¶ 18, 973 P.2d 270, 282.

■ ¶ 30 Any ambiguity in S.A.'s responses was cleared up by additional questioning from the trial court. In the potential juror's last recorded answer, she was unequivocal in her decision that she could not consider all three punishments. Therefore, we find no abuse of the trial court's discretion in excusing her for cause.

■ ¶ 31 Appellant finds error in the trial court's refusal to allow the defense to further question the potential jurors. However, "[w]hen the proper questions have been asked by the trial court to determine whether prospective jurors can sit in the case, it is not error to deny defense counsel an opportunity to rehabilitate the excused jurors." *Littlejohn v. State*, 2004 OK CR 6, ¶ 49, 85 P.3d 287, 301–302. The initial question to each prospective juror was whether the juror could give meaningful consideration to all three possible punishments—life, life without parole and death. If the prospective juror indicated they could not consider all three punishments, in most cases the court went on to ask whether the juror could set aside their opinion and decide the issues in this case on the evidence and/or could the juror follow the court's instructions to consider all three punishments.[3] These were appropriate questions to ask the potential jurors. In the face of such unequivocal responses as in the present case, no further questioning was necessary. When the court received equivocal responses, such as those from F.F. and J.P. further questioning was conducted.

---

3. In *Mitchell III*, this Court said that the standard for determining a potential juror's willingness to consider the death penalty does not "require that a juror be willing to state that he or she can think of some situation in which he or she will actually vote to impose or recommend a death sentence." 2006 OK CR 20, ¶ 39, 136 P.3d at 690. In the present case, various forms of the question whether the juror could envision a set of circumstances where the juror could give the death penalty were posed by the trial court. However, that question was almost always followed by an inquiry into whether the juror could follow the court's instructions to consider all three punishments. Any error in asking the "set of circumstances" question was cured by the court's question referencing its instructions and the juror's ability to follow such.

¶ 32 Appellant further challenges the death qualification questions asked by the trial court, arguing the court did not follow the uniform jury instructions. The record reflects that in his initial questioning, the trial judge followed the questions set out in Oklahoma Uniform Jury Instruction–Criminal (OUJI–CR 2d) 1–5. However, in further questioning, the court used the terms "meaningful consideration" and "equivocal", language not contained in the uniform instruction. The record reflects the term "meaningful consideration" was used interchangeably with "consideration" or "consider" by the court, the prosecutor and defense counsel. While in a footnote to *Mitchell III*, we cautioned court's against attempts to define or further explain the term "consider", 2006 OK CR 20, ¶ 40, 136 P.3d at 690, n. 97, we find no error in the use of the term here. *See Powell v. State*, 2000 OK CR 5, ¶ 28, 995 P.2d 510, 520–521 (no error found in the trial court asking potential jurors if they could give "equal consideration" to the three sentencing options). There is no indication the term caused any confusion among the potential jurors.

¶ 33 Also in a footnote to *Mitchell III*, this Court "agree[d] with the trial court's initial approach of avoiding the word "unequivocal" when questioning prospective jurors" finding "the term could confuse many jurors." 2006 OK CR 20, ¶ 41, 136 P.3d at 690, n. 99. In the record before us, we find no indication the use of the term caused any confusion.

¶ 34 Contrary to Appellant's claim that all the jurors now challenged were excused due to their views on capital punishment, the record shows that F.F. and J.P. were properly excused due to the influence of outside matters affecting their ability to sit as fair and impartial jurors. As the trial court was able to directly observe and evaluate the nine potential jurors discussed in this proposition, we find no abuse of discretion in their dismissal for cause.

¶ 35 In Proposition VI, Appellant contends that limitations placed on counsel during *voir dire* hindered his intelligent exercise of peremptory challenges and denied him due process of law under the federal and state constitutions. Specifically, Appellant complains the trial court erred in: 1) refusing his request to introduce the prosecution's crime scene photographs and publish them to the venire; 2) refusing to advise the jury of the aggravating circumstances alleged and give a definition of mitigating evidence, and 3) limiting the questions he could ask concerning the jurors' views on the death penalty.

¶ 36 In denying the defense requests, the trial court noted, "you can't try the case in *voir dire*." (Tr. Vol. I, pg. 356). While we have previously noted that an important aspect of *voir dire* is to educate the jury on what will be asked of them under the law, *Eizember*, 2007 OK CR 29, ¶ 40, 164 P.3d at 208, it has long been recognized that a party is not to present evidence or argue the law during *voir dire*. In *Scott v. State*, 1982 OK CR 108, ¶¶ 15–16, 649 P.2d 560, 562, *quoting Kephart v. State*, 93 Okl.Cr. 451, 229 P.2d 224, 229 (1951) this Court stated:

> However the attorneys are not permitted to make statements of the law and seek to get a statement in advance of the trial as to how the jurors would decide the case on a given set of facts.

> In the examination of a venireman … neither party has the right to assume the facts of the case in detail, and assume that the court will instruct the jury in a particular way …

*See also Jones v. State*, 20 Okl.Cr. 154, 201 P. 664 (1921).[4]

¶ 37 In the present case, the crime scene photographs had not been admitted into evidence at the time defense counsel sought to show them to the jury. Therefore the trial court appropriately denied the defense's request. The defense was able to address the

4. In *Jones*, 201 P. at 668, this Court said:
It is generally held that a party examining a venireman has no right to assume the facts of the case on trial, and to ascertain the juror's opinion on them in advance; and that a hypothetical question put to a venireman, calling for his decision on a question of law and for a statement by him as to the party in whose favor he would decide it in a supposed state of the evidence, calls for a prejudgment of the case, and that the sustaining of an objection to such a question is not error.

issue of the photographs as both the State and the defense were permitted to ask the potential jurors if they could be fair despite gruesome photographs of the crime scene.

¶ 38 The trial court sufficiently informed the potential jurors of the role of aggravating circumstances in a capital trial, the State's burden to prove those aggravators beyond a reasonable doubt, the role of mitigating evidence and the jury's duty to weigh the evidence in aggravation against that in mitigation. The trial court did not abuse its discretion in preventing defense counsel from discussing the specific aggravators alleged in this case as that would have been a premature entry into the specific facts of the case.

¶ 39 In support of his argument that the trial court improperly limited his questioning of potential jurors concerning their views on the death penalty, Appellant directs us to the questioning of potential juror J.W. Defense counsel asked for the juror's viewpoint on capital punishment. This inquiry brought an objection from the prosecutor. A lengthy bench conference ensued in which judge, prosecutor, and defense counsel discussed questions designed to elicit a potential juror's view on the death penalty. One of defense counsel's suggestions was that a numerical scale be used to gauge the jurors' support of the death penalty. After an objection from the prosecutor, defense counsel admitted she was not trying to elicit views on issues this Court has found inappropriate, *e.g.*, the deterrent effect and cost effectiveness of the death penalty. The trial court advised counsel the most effective question was, "are you in favor of the death penalty" or "are you not opposed to the death penalty?" (Tr. Vol. II, pgs. 418–427). Defense counsel objected and noted the questions she sought to ask the potential jurors. The trial judge explained that defense counsel's questions were "phrased in such a way as to open up the door to all kinds of things not admissible." (Tr. Vol. II, pgs. 426–427). Counsel then asked each potential juror which of two phrases better fit their viewpoint on capital punishment—"I am in favor of capital punishment as a sentencing option" or "I am not

opposed to capital punishment as a sentencing option." (Tr. Vol. II, pgs. 428).

¶ 40 The trial court may properly restrict questions on *voir dire* that are repetitive, irrelevant or regard legal issues upon which the trial court will instruct the jury. *Patton,* 1998 OK CR 66, ¶ 9, 973 P.2d at 280. The trial court's limitations in the present case did not deprive the defense of information necessary to intelligently exercise peremptory challenges. Appellant's constitutional rights were not violated when the trial court restricted the questioning on *voir dire* as an impartial jury was seated without the specific inquiries sought by Appellant. Appellant's reference to the questioning of prospective juror D.F. as an example of the need for additional questioning actually supports the conclusion that the trial court granted additional questioning when necessary. Despite saying he could be fair and impartial, potential juror D.F.'s answers were equivocal on whether he could consider the mitigating evidence. Defense counsel's request for additional questioning was granted. The additional questioning showed the prospective juror would not be able to listen and consider all of the mitigating evidence. Therefore, he was properly excused for cause.

¶ 41 A review of the record shows the trial court did not abuse its discretion in the manner in which *voir dire* was conducted. The record clearly shows defense counsel was allowed sufficient *voir dire* to determine if there were grounds to challenge a particular juror for cause and to intelligently exercise peremptory challenges. In many instances, defense counsel's request for individual *voir dire* was granted.

¶ 42 Now on appeal, Appellant has not stated how he would have used his peremptory challenges differently given additional information nor has he cited to any sitting juror with any prejudices against him. Our review of the record shows a jury free of outside influence, bias and personal interest was selected to hear Appellant's case. Therefore, given the traditionally broad discretion accorded to the trial judge in conducting *voir dire,* and our inability to discern any possible prejudice from not allowing further general questioning, we find Appellant's

constitutional rights were not violated by *voir dire*. Appellant's challenges to jury selection are hereby denied.

## Issues Relating to the Sentencing Stage of Trial

¶ 43 Appellant asserts in his first proposition of error that upon remand from the Tenth Circuit Court of Appeals he was entitled to a new trial on guilt/innocence rather than merely resentencing under 21 O.S.2001, § 701.10a. Appellant argues that § 701.10a provides only for resentencing when prejudicial errors are found in the sentencing stage of trial, and that as the *Brady*[5] violation found in his case was a first stage error, he is entitled to a new guilt/innocence trial irrespective of the Tenth Circuit's remand for resentencing only.

¶ 44 Appellant first raised his *Brady* claim to the United States District Court for the Western District of Oklahoma. He argued the rape and sodomy convictions should be found invalid as the State did not disclose exculpatory information regarding the rape and sodomy charges, and that his death sentence was therefore tainted and unreliable and should be vacated. *Mitchell v. Ward*, 150 F.Supp.2d at 1220–21. The Western District found a *Brady* violation had occurred and that such error undermined the confidence in the rape and sodomy verdicts. Habeas relief as to those convictions was granted. *Id.* 150 F.Supp.2d at 1229, 1263. However, the Court found sufficient evidence supported the three aggravating circumstances, even without the rape and sodomy convictions, and upheld the death sentence. *Id.* 150 F.Supp.2d at 1230. The Western District denied habeas relief on all challenges to the murder conviction, thus leaving the conviction intact. *Id.*

¶ 45 On appeal to the Tenth Circuit Court of Appeals, Appellant argued the invalid rape and sodomy convictions required vacation of the death sentence. *Mitchell v. Gibson*, 262 F.3d at 1060. The Tenth Circuit found that Appellant had shown that absent the *Brady* violation, there was a reasonable probability the result of the sentencing proceeding would have been different. *Id.* 262 F.3d at 1066. Therefore, the Tenth Circuit granted habeas relief on the claim that Appellant's sentence violated his right to due process and ordered Appellant be resentenced. *Id.* 262 F.3d at 1066. Habeas relief was denied on all challenges to the murder conviction and that conviction was upheld. *Id.*

¶ 46 Appellant now attempts to recast his *Brady* argument as an attack on the validity of the murder conviction, despite the fact he has never previously argued the error touched upon the reliability of his murder conviction.[6] Under the doctrine of *res judicata*, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980). *Res judicata* precludes the relitigation of any issue that was "necessarily decided" in a prior proceeding. *U.S. v. Howe*, 590 F.3d 552, 556 (8th Cir. 2009). To determine what was "necessarily decided", we look to the record of the prior proceeding. *Id.*

¶ 47 In determining whether Appellant's current *Brady* claim is *res judicata*, we find the history of the proceedings in this case shows that two different federal courts have decided that the prosecution's suppression of exculpatory evidence relating to the rape and sodomy charges did not cast doubt on the validity of the murder conviction. In reaching this conclusion, the record shows the Western District and Tenth Circuit did not consider the *Brady* violation in a vacuum, but adjudicated the error in context of the overall trial.[7] The record shows the federal courts fully considered every dimension of the *Bra-*

---

5. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

6. This includes Appellant's failure to raise the issue in the direct appeal of his first resentencing, despite having every opportunity to do so.

7. Following oral argument, this Court directed supplementation of the record, pursuant to Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2009), with the briefs filed by Appellant in both the Western District and the Tenth Circuit. Upon review of those briefs, we find those courts appropriately adjudicated the propositions of error as raised.

*dy* violation, including its possible effect on Appellant's murder conviction. In upholding the validity of the murder conviction, the Western District and Tenth Circuit impliedly, if not explicitly, concluded the *Brady* violation had no effect on the underlying murder conviction. Whether Appellant was entitled to a new guilt/innocence trial on the murder conviction was necessarily decided by the federal courts. Therefore, his current challenge to the validity of that conviction is barred by the doctrine of *res judicata*. *See Pickens v. State*, 2001 OK CR 3, ¶ 16, 19 P.3d 866, 875.[8] *See also Wells v. Sheriff, Carter County*, 1968 OK CR 109, ¶ 20, 442 P.2d 535, 540 (full faith and credit must be accorded a final judgment of a foreign state or the federal courts so long as it is sufficiently shown that such court possessed jurisdiction to determine the issues involved). This proposition of error is denied.

■■■ ¶ 48 In Proposition II, Appellant contends he should have been accorded a *Jackson v. Denno*[9] hearing at his resentencing trial. Appellant's custodial statements have repeatedly been found voluntary. *See Mitchell I*, 1994 OK CR 70, ¶¶ 12–14, 884 P.2d at 1194–1195[10]; *Mitchell v. Ward*, 150

F.Supp.2d at 1213[11]; *Mitchell v. Gibson*, 262 F.3d at 1060.[12] Appellant did not seek a petition for rehearing or rehearing *en banc* before the Tenth Circuit nor a petition for a writ of certiorari in the United States Supreme Court to challenge the denial of his involuntary statement claim.

¶ 49 The admissibility of Appellant's previously determined voluntary statements is specifically permitted under 21 O.S.2001, § 701.10a(4) ("[a]ll exhibits and a transcript of all testimony and other evidence properly admitted in the prior trial and sentencing shall be admissible in the new sentencing proceeding").

¶ 50 The only new argument raised by Appellant is that at the second resentencing trial, Detective Maddox testified that Appellant was a suspect when the interviews with police began on September 8, 1991, while in 1992 Detective Maddox testified that Appellant was not a suspect when the interviews began and did not become a suspect until later that day. Contrary to Appellant's claim, this change in testimony does not cast the entire police interview in a different light.

---

**8.** On February 4, 1990, Pickens committed first degree murder and robbery in Creek County. Five days later, he committed another murder in Tulsa County. Approximately one month later, he confessed to the crimes committed in both counties. In *Pickens v. State*, 1993 OK CR 15, 850 P.2d 328 (referred to as *Pickens I*), this Court affirmed the conviction and death sentence for crimes committed in Tulsa County. This Court rejected Pickens' claim that his confession was taken in violation of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). 1993 OK CR 15, ¶¶ 11–17, 850 P.2d at 333–334. In *Pickens v. State*, 1994 OK CR 74, 885 P.2d 678, *overruled in part on other grounds*, 1996 OK CR 19, 917 P.2d 980 (hereinafter referred to as *Pickens II*), this Court reversed and remanded for a new trial the convictions from Creek County. On re-trial, Pickens was again convicted and sentenced to death. This Court affirmed the judgment and sentence in *Pickens v. State*, 2001 OK CR 3, 19 P.3d 866, 875. In that appeal, Pickens asserted his statement to Creek County law enforcement was improperly admitted because he had previously invoked his right to counsel during his interrogation on the Tulsa County charges. This Court held that as it had been determined in *Pickens I* that the Tulsa confession was not obtained in violation of Pickens' Fifth Amendment rights, his subsequent challenge to the confession was barred by the doc-

trine of *res judicata*. 2001 OK CR 3, ¶ 16, 19 P.3d at 875.

**9.** *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

**10.** This Court stated in part:

Mitchell's argument must finally fail because he cites no instances of coercion, relying only on a picture of a pitifully confused defendant. Even were this description correct, any confession is voluntary absent coercion. Mitchell's worst accusation here appears to be continued interrogation. This simply is not coercion and cannot be used to support this claim.
1994 OK CR 70, ¶ 14, 884 P.2d at 1195.

**11.** The Western District stated in part:

This Court cannot say, and, in fact, Petitioner does not argue, that the Court of Criminal Appeals' decision [regarding the voluntariness of his statements] is contrary to, or involves an unreasonable application of, Federal law as determined by the Supreme Court.
150 F.Supp.2d at 1213.

**12.** "We see nothing in the totality of the circumstances to show that any factor undermined the voluntariness of his statements." 262 F.3d at 1060.

Detective Maddox testified in 1992 and in 2007 that Appellant was *Mirandized* [13] prior to the beginning of the police interview on September 8, 1991. *Mitchell I,* 1994 OK CR 70, ¶ 5, 884 P.2d at 1192. Maddox's 2007 testimony at most shows a witness with a faulty memory. The trial court's failure to hold a second *Jackson v. Denno* hearing is not grounds for relief. This proposition is denied.

¶ 51 In his third proposition of error, Appellant asserts the trial court erred in admitting his testimony from his first trial claiming its admission violated the due process guarantees of the federal and state constitutions. Relying on *Harrison v. United States,* 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968) and *Littlejohn v. State,* 2004 OK CR 6, 85 P.3d 287, Appellant argues it was error to admit his prior testimony because his testimony was induced by the false and misleading evidence given by state's witness Joyce Gilchrist. Appellant asserts that but for Ms. Gilchrist's testimony in the first trial, that the semen she found on rectal and vaginal swabs were consistent with Appellant, he would not have testified to specifically deny the rape and sodomy charges.

¶ 52 In *Littlejohn,* this Court stated:

In *Harrison,* 392 U.S. at 222, 88 S.Ct. at 2010, the Supreme Court recognized the general evidentiary rule that a defendant's testimony at a former trial is admissible in evidence against him in later proceedings. "A defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives, and that waiver is no less effective or complete because the defendant may have been motivated to take the witness stand in the first place only by reason of the strength of the lawful evidence adduced against him." *Id.* However, where a defendant, like in *Harrison,* is compelled to testify to rebut inadmissible confessions sponsored by the State, later use of the defendant's former testimony against him is prohibited. *Id.*

2004 OK CR 6, ¶ 31, 85 P.3d at 298.

¶ 53 Appellant's argument focuses on a small portion of his trial testimony; his responses to three questions by the prosecutor in which he unequivocally denied raping or sodomizing the deceased. Appellant concedes that the remainder of his testimony was cumulative to that of other witnesses.

¶ 54 In *Mitchell III,* this Court stated that based upon the evidence, the prosecution was prohibited from arguing that Appellant raped the deceased but the State could argue that Appellant attempted to rape the deceased. 2006 OK CR 20, ¶ 32, 136 P.3d at 687, n. 82. Reading the challenged testimony in context, no reference is made to the filing of any criminal charges against Appellant for rape or sodomy. Appellant's responses negate any implication of having committed either offense. His brief denials were the only testimony addressing the tainted Gilchrist evidence. The record shows that the reason Appellant took the witness stand in his first trial was to explain why he had given so many different stories to the police, both before and after he was arrested, and to exculpate himself and inculpate "C. Ray." In light of testimony from witnesses at the scene placing Appellant there both before and after the murder, and evidence of his shoe print found in the deceased's blood, Appellant's claim that but for the Gilchrist testimony he would not have testified is untenable.

¶ 55 Even if this brief portion of Appellant's prior trial testimony should have been excluded, any error stemming from its admission was harmless beyond a reasonable doubt and did not contribute to the death sentence. Evidence of Appellant's attempted rape of the deceased was presented in support of the "avoid arrest" aggravator. That aggravator was rejected; the jury finding the evidence sufficient to establish the existence of only the "heinous, atrocious or cruel" aggravator. As discussed later in this opinion, this aggravator was supported by sufficient evidence, separate and apart from evidence of any sexual assault of the deceased. Therefore, Appellant's request to vacate his death sentence due to the introduction of this

---

13. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

limited portion of his trial testimony is denied.

¶ 56 In his seventh proposition of error, Appellant challenges the admission of photographs of the deceased and the crime scene. He claims that fourteen (14) crime scene photographs showing the deceased's partially nude, beaten body; eleven (11) autopsy photographs and thirty (30) general crime scene photographs were gruesome and unfairly prejudicial because the State did not publish them to the jury at the time of their introduction but waited until closing argument. Defense counsel's objection at trial has properly preserved the issue for appellate review.

¶ 57 The admissibility of photographs is a matter within the trial court's discretion and absent an abuse of that discretion, this Court will not reverse the trial court's ruling. *Warner,* 2006 OK CR 40, ¶ 167, 144 P.3d at 887. Photographs are admissible if their content is relevant and their probative value is not substantially outweighed by their prejudicial effect. *Id.* The probative value of photographs of murder victims can be manifested in numerous ways, including showing the nature, extent and location of wounds, establishing the *corpus delicti,* depicting the crime scene, and corroborating the medical examiner's testimony. *Id.*

¶ 58 Many of the photographs in this case were introduced during the testimony of Tom Bevel and illustrated his theory of blood spatter and blood transfer evidence. Bevel testified that the deceased had been stabbed in the neck with the school compass [14] that was found underneath her. He also testified the blood smear and blood transfer evidence showed that the deceased was moving during the attack and that the attack was particularly violent and brutal. Photographs illustrating this testimony aided the jury in understanding the nature of the attack on the deceased and helped explain the final location of her body.

¶ 59 Autopsy photographs supported the testimony of the medical examiner and aided the jury in understanding the nature of the wounds suffered by the deceased. The photographs were relevant to support the State's allegation of the existence of the "heinous, atrocious or cruel" aggravator as they showed the deceased suffered serious physical abuse prior to her death.

¶ 60 Appellant's argument that the photographs were unduly prejudicial because the manner of death was not disputed has been previously rejected by this Court. *See Patton,* 1998 OK CR 66, ¶ 59, 973 P.2d at 290. Likewise, Appellant's argument that the photographs were unduly prejudicial because his guilt was not contested fails. Title 21 O.S. 2001, § 701.10a specifically provides that "[a]ll exhibits and a transcript of all testimony and other evidence properly admitted in the prior trial and sentencing shall be admissible in the new sentencing proceeding[.]" *See Fitzgerald v. State,* 2002 OK CR 31, ¶ 11, 61 P.3d 901, 905.

¶ 61 Further, Appellant's argument that the photographs were unduly prejudicial because they were gruesome does not warrant relief. In *Patton,* we said:

> The fact that the photographs may be gruesome does not of itself cause the photographs to be inadmissible. "Gruesome crimes result in gruesome pictures." *McCormick v. State,* 845 P.2d 896, 898 (Okl.Cr.1993). There is no requirement that the visual effects of a particular crime be down played by the State. *Id.* "The only consideration to be made is whether the pictures are unnecessarily hideous, such that the impact on the jury can be said to be unfair". *Id.*

1998 OK CR 66, ¶ 60, 973 P.2d at 290.

¶ 62 As neither the manner of death nor Appellant's guilt is disputed, "[w]e are unable to sympathize with Appellant when he complains that the photos are graphic and are somewhat confused that he would expect them to be otherwise." *Smallwood v. State,* 1995 OK CR 60, ¶ 35, 907 P.2d 217, 228.

14. *Websters II New Riverside University Dictionary* 289 (1984) defines compass as "a v-shaped device for drawing circles or circular arcs, having a pair of rigid, end-hinged, and continuously separable arms, one of which is equipped with a writing implement and the other with a sharp point providing a central anchor or pivot about which the drawing arm is turned."

¶ 63 Appellant's complaint about the volume of photographs also does not warrant relief. In *Mitchell III,* this Court was troubled by the admission of photographs of the crime scene as well as a videotape of the crime scene showing the deceased's body. 2006 OK CR 20, ¶ 53, 136 P.3d at 695. This Court found much of the evidence was admissible, but the trial court had abused its discretion by failing to properly constrain the State in its presentation of the evidence, much of which was cumulative. *Id.* The record of this second resentencing reflects that the trial court was well aware of this Court's rulings in *Mitchell III,* and worked hard not to commit the same errors. The crime scene videotape was not admitted into evidence in the second resentencing and the number of photographs admitted was reduced. While there was some duplication in the images reflected in the photographs, Appellant has failed to meet his burden of showing the repetition was needless or inflammatory. *Warner,* 2006 OK CR 40, ¶ 168, 144 P.3d at 887.

¶ 64 Finally, Appellant finds error in the prosecution's publication of some of the photographs during closing argument, instead of when they were introduced during a witnesses' testimony. Defense counsel argued at trial that withholding the photographs throughout trial until closing argument was so inflammatory as to violate due process and fundamental fairness. Denying Appellant's objection, the trial court found the photographs had been admitted into evidence therefore they could be published to the jury and the jury could take them to deliberations. The judge noted that many of the photographs had been cropped and cut down and that the total number of admissible photographs had been reduced.

¶ 65 Appellant does not cite any authority requiring that all exhibits admitted into evidence be published prior to closing argument. Further, he has failed to show any prejudice resulting from the timing of the admission of the photographs.

¶ 66 Having found the photographs relevant, they may still be excluded from evidence if the probative value of the photographs is outweighed by their prejudicial impact on the jury. 12 O.S.2001, § 2403. "In reviewing the prejudicial impact of photographs this Court has said that '[w]here the probative value of photographs . . . is outweighed by their prejudicial impact on the jury that is, the evidence tends to elicit an emotional rather than rational judgment by the jury then they should not be admitted into evidence.'" *Short v. State,* 1999 OK CR 15, ¶ 27, 980 P.2d 1081, 1094. Applying that standard to this case, we find the photographs introduced were probative and that probative value was not outweighed by any prejudicial impact. The evidence overwhelmingly supported the "heinous, atrocious or cruel" aggravator and there is no indication the jury's verdict was an emotional response rather than a rational judgment based on the evidence.

¶ 67 Based upon our review of the photographic evidence introduced in this case, we find the errors committed in the first resentencing concerning admission of this evidence were not repeated in this case. The trial court properly "constrained" the State's presentation of this evidence and did not abuse its discretion in the admission of the photographs. This proposition of error is denied.

¶ 68 In his eighth proposition of error, Appellant argues that the crime scene reconstruction testimony of Tom Bevel was unnecessary and usurped the fact finding function of the jury. As in the 2002 resentencing trial, Bevel's crime scene reconstruction testimony was used to help establish the various events involved in Appellant's attack upon the deceased and the most likely sequence of those events. In *Mitchell III,* this Court summarized Bevel's testimony at Appellant's 2002 resentencing trial:

Bevel testified extensively about what the physical evidence at the crime scene—including the bloodstain patterns, the position of Scott's body, the location of various objects, *etc.*—suggested about the "weapons" Mitchell used to attack Scott (including his hands, a golf club, a compass, and a coat rack) and the order in which they were used. Bevel also testified about the likelihood of some type of sexual attack

upon Scott prior to her death. He noted hip bruises consistent with someone exerting pressure in this area, and also that the lack of significant blood on her clothing was inconsistent with a scenario in which the clothing was removed after her death. 2006 OK CR 20, ¶ 68, 136 P.3d at 700–01, n. 150.

¶ 69 Bevel's testimony in the 2007 resentencing was substantially the same. In *Mitchell III*, this Court found Bevel's testimony establishing the various events involved in Appellant's attack upon the deceased and the most likely sequence of those events relevant to the jury's determination regarding the "heinous, atrocious, or cruel" aggravating circumstance. *Id.* 2006 OK CR 20, ¶ 68, 136 P.3d at 701. We do so again.

¶ 70 Appellant also argues Bevel's testimony was unreliable as he could not say how long the entire event lasted from start to finish, and his theory that it all happened in at most five minutes was simply impossible. The starting point for the sequence of events which included the deceased's murder was the departure of Carolyn Ross from the Pilot Center and ended with the arrival of Allen Briggs at the Center. Both Ms. Ross and Mr. Briggs gave approximate times for their departure and arrival. Bevel testified that due to these approximate times, he did not have sufficient information to say exactly how long the assault inside the Pilot Center lasted. The weight and credit to be given Bevel's testimony was within the province of the jury. *See Bland v. State*, 2000 OK CR 11, ¶ 29, 4 P.3d 702, 714.

■ ¶ 71 Relying on 12 O.S.2001, § 2403, Appellant also argues Bevel's testimony was needlessly cumulative to that of Carolyn Ross and Captain Vance Allen. Section 2403 provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise. When measuring the relevancy of evidence against its prejudicial effect, the court should give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value. *Mayes v. State*, 1994 OK CR 44, ¶ 77, 887 P.2d 1288, 1310.

¶ 72 Ms. Ross and Captain Allen testified to events occurring immediately before and after Appellant's assault on the deceased. Bevel's expert testimony was based in part on evidence provided by Ross and Allen. His testimony exceeded that given by Ross and Allen and his references to their testimony showed how the various accounts of that day were interconnected. Contrary to Appellant's argument, the order in which the events of January 7, 1991, occurred was relevant in the resentencing proceeding as it showed that the deceased suffered serious physical abuse prior to her death thus establishing the aggravator of "especially heinous, atrocious or cruel." Appellant was not denied a fair sentencing by the admission of the crime scene reconstruction testimony. This proposition is denied.

■ ¶ 73 In Proposition IX, Appellant asserts the DNA evidence should have been suppressed as the State failed to prove the chain of custody. Specifically, he complains that no evidence was introduced to indicate where samples sent by Joyce Gilchrist to Brian Wraxall came from and at what point Ms. Gilchrist obtained them.[15] Appellant raised this objection before the trial court and has therefore properly preserved the issue for appellate review.[16]

■ ■ ¶ 74 The purpose of the chain of custody rule is to guard against substitution of or tampering with the evidence between the time it is found and the time it is analyzed. *Alverson v. State*, 1999 OK CR 21, ¶ 22, 983 P.2d 498, 509. Although the State has the burden of showing the evidence is in substantially the same condition at the time of offering as when the crime was committed,

---

15. Ms. Gilchrist worked in the Oklahoma City Police Department Laboratory. Mr. Wraxall was the Executive Director and Chief Forensic Serologist of the Serological Research Institute in Richmond, California.

16. The trial court denied the objection based on the defense's failure to make a written demand for every person in the chain of custody to be presented, pursuant to 22 O.S.2001, § 751.1(C)(2).

it is not necessary that all possibility of alteration be negated. *Id.* If there is only speculation that tampering or alteration occurred, it is proper to admit the evidence and allow any doubt to go to its weight rather than its admissibility. *Id.*

¶ 75 Mr. Wraxall testified that in 1992 he performed DNA analysis on evidence received from the Oklahoma City Police Department Laboratory. In a further analysis conducted in 2002 he extracted a sperm cell from a sample of semen found on the deceased's body. He compared the DNA found therein to the DNA in a known blood sample from Appellant and discovered the DNA profiles matched with the odds of anyone else having the same DNA as 1 in 9 trillion.

¶ 76 On cross-examination, Mr. Wraxall said that all of the samples he tested he had received from Ms. Gilchrist. He said he did not know how the samples were collected or where they had been before he received them. Ms. Gilchrist was not a witness in this resentencing proceeding.

¶ 77 Evidence at the resentencing established that Appellant admitted to masturbating on or near the deceased's body and that the semen found on the deceased's body could have only come from ejaculate onto the deceased's body or the sheet in which her body was carried from the crime scene. Appellant offers only speculation that some sort of tampering or substitution of evidence occurred prior to the time Gilchrist sent the evidence to Wraxall. Therefore, any doubts about the credibility of the evidence went to its weight not its admissibility. This proposition is denied.

¶ 78 In Proposition XI, Appellant contends that as he was only two weeks past his eighteenth birthday when he killed the deceased, the proscription against capital punishment of juvenile murderers set forth in *Roper v. Simmons,* 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), should be extended to him in light of the mitigating evidence he presented. Appellant's motion to dismiss

the Bill of Particulars on this ground was overruled by the trial court.

¶ 79 This is an issue of first impression for this Court. In *Roper,* the United States Supreme Court declared it unconstitutional under the Eighth Amendment for a state to execute any individual who was under the age of eighteen (18) at the time of the offense. Noting that a majority of states have rejected the imposition of the death penalty on juveniles under 18, the Court found evidence sufficient to demonstrate a "national consensus".[17] 543 U.S. at 564, 125 S.Ct. at 1192. "The evidence of national consensus against the death penalty for juveniles is similar, and in some respects parallel, to the evidence *Atkins* held sufficient to demonstrate a national consensus against the death penalty for the mentally retarded." *Id.* In justifying the prohibition of the death penalty on those less than 18 years of age, the Supreme Court noted three general differences between juveniles under 18 and adults which demonstrated that juvenile offenders cannot with reliability be classified among the worst offenders. These three factors were lack of maturity and an underdeveloped sense of responsibility, vulnerability to outside influences, and that a juvenile's character is not as well formed as that of an adult. 543 U.S. at 569, 125 S.Ct. at 1195. Appellant recognizes the application of *Roper* but asserts his lack of maturity and an underdeveloped sense of responsibility, his vulnerability to outside influences, and character deficiencies exclude him from the death penalty.

¶ 80 In *Bowling v. Commonwealth of Kentucky,* 224 S.W.3d 577 (Ky.2006), the appellant argued for an extension of *Roper* to offenders who committed murder while their mental age was less than 18 years. The appellant argued that the three factors relied on in *Roper* applied to him because his mental age was below 18 years due to his mental retardation. In rejecting the appellant's argument, the *Bowling* Court noted that *Roper* had established a "bright line demarcation", stating, "[t]he age of 18 is the point where society draws the line for many purposes

---

**17.** While I cannot find a legal basis in either the federal or Oklahoma constitution for the use of polls in the interpretation of a constitutional

right, I accede to the fact this "national consensus" mantra is a part of the federal death penalty jurisprudence.

between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest." *Id.* 224 S.W.3d at 580. The *Bowling* Court held that "[t]he plain language of *Roper* compels the conclusion that its prohibition is limited to 'the execution of an offender for any crime committed before his 18th birthday....'" *Id.* at 583 *quoting Roper,* 543 U.S. at 588, 125 S.Ct. at 1206, 161 L.Ed.2d at 38 (O'Connor, J. dissenting).

¶ 81 The *Bowling* Court noted it was not unaware of the concept of juvenile mental age as a basis to preclude the death penalty as discussed in *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). *Id.* However, finding no language in *Roper* to support such a conclusion and that the Supreme Court "would have explicitly adopted mental age as a criterion had it wished to do so," the appellant's ·failure to cite any published authority prohibiting the death penalty based upon "juvenile mental age," and his failure to demonstrate a national consensus that mental age should be a criterion by which to exclude the death penalty, the *Bowling* Court concluded that *Roper* only prohibited the execution of those offenders whose chronological age was below eighteen at the time of the commission of the offense. *Bowling,* 224 S.W.3d at 584.

¶ 82 We find the *Bowling* decision well reasoned and persuasive. Appellant has not cited any authority to the contrary. The U.S. Supreme Court has drawn a bright line at eighteen (18) years of age for death eligibility and we therefore reject Appellant's argument that being two weeks beyond his eighteenth birthday at the time of the murder exempts him from capital punishment. Under the plain language of *Roper,* the prohibition against capital punishment is limited to the execution of an offender for any crime committed before his 18th birthday.

¶ 83 Appellant further argues *Roper* prohibits the use of juvenile adjudications to support aggravating circumstances. The trial court overruled Appellant's motion to preclude use of his juvenile adjudication of rape pursuant to *Roper.* Again, this is a case of first impression for this Court.

¶ 84 This Court has consistently held that evidence of unadjudicated bad acts, non-violent bad acts and juvenile offenses are admissible in a capital case to prove a defendant constitutes a continuing threat to society. *Douglas v. State,* 1997 OK CR 79, ¶¶ 85–87, 951 P.2d 651, 675–76 and cases cited therein. Nothing in the language of *Roper* suggests that the State is prohibited from relying on prior juvenile adjudications to support an aggravating circumstance.

¶ 85 This conclusion is not novel. In *Lowe v. State,* 2 So.3d 21, 46 (Fla.2008) the appellant claimed that his death sentence was unconstitutional because the State used prior convictions which arose from crimes committed by Lowe before he was eighteen years of age to establish an aggravating· factor, and that the use of the juvenile convictions is in violation of the Eighth Amendment and *Roper v. Simmons.* The Florida Supreme Court rejected the argument stating "*Roper* does not stand for this proposition." *Id.*

¶ 86 In *United States v. Wilks,* 464 F.3d 1240 (11th Cir.2006) the appellant argued that *Roper* prohibited the use of his youthful offender convictions for sentence enhancement. In rejecting this argument, the Eleventh Circuit Court of Appeals stated:

> Our conclusion that youthful offender convictions can qualify as predicate offenses for sentence enhancement purposes remains valid because *Roper* does not deal specifically—or even tangentially—with sentence enhancement. It is one thing to prohibit capital punishment for those under the age of eighteen, but an entirely different thing to prohibit consideration of prior youthful offenses when sentencing criminals who continue their illegal activity into adulthood. *Roper* does not mandate that we wipe clean the records of every criminal on his or her eighteenth birthday.

464 F.3d at 1243.

¶ 87 We find nothing in *Roper* to support Appellant's claim of exclusion from the death penalty and no abuse of discretion in the trial court's admission of Appellant's prior juvenile adjudication to support the "continuing threat" aggravator. Further, Appellant has failed to show any resulting prejudice by the admission of his juvenile adjudication as the

jury rejected both the "continuing threat" and the "avoid arrest" aggravators that relied on the evidence. This proposition is therefore denied.

## Jury Instructions

¶ 88 In Proposition XII, Appellant contends the trial court erred in failing to instruct the jury to give consideration to any questions it might have concerning Appellant's guilt of first degree murder. His claim is based on a note received from the jury during deliberations asking whether Appellant had been convicted of premeditated murder. Appellant asserts the note indicates that at least one juror harbored some doubt regarding the murder conviction. We review only for plain error as this objection is being raised for the first time on appeal. *Bernay v. State*, 1999 OK CR 37, ¶ 49, 989 P.2d 998, 1012.

¶ 89 Resentencing proceedings should not be viewed as a second chance at revisiting the issue of guilt. *Rojem v. State*, 2006 OK CR 7, ¶ 56, *130 P.3d 287*, 299. Evidence relating to residual doubt is "not relevant to the defendant's character, record, or any circumstance of the offense." *Id. quoting Bernay*, 1999 OK CR 37, ¶ 50, 989 P.2d at 1012. To tell the jury as defense counsel did in opening statement that Appellant had been convicted of first degree murder, yet later tell them to consider residual doubt as mitigation evidence would be inconsistent and confusing. *Rojem*, 2006 OK CR 7, ¶ 55, 130 P.3d at 298. We find no plain error in the trial court's failure to instruct the jury on residual doubt.

## Victim Impact Evidence

¶ 90 In his thirteenth proposition of error, Appellant raises three challenges to the victim impact evidence; 1) it focused solely on the emotional aspect of the family's loss and described the Scott's family life prior to the homicide, 2) it operates as a super aggravator under Oklahoma's death penalty scheme and has no place in our weighing system, and 3) OUJI–CR (2d) 9–45 improperly instructed the jury as to the scope of victim impact evidence.

¶ 91 Three victim impact witnesses testified at the re-sentencing—the deceased's father, mother, and brother. This testimony comprised only eleven pages out of the 1,664 pages of transcript. The victim impact statements appear to be substantially the same as those given in the first re-sentencing trial. Cognizant of our review of the evidence presented in the first re-sentencing proceeding, the trial court reviewed the statements *in camera* and significantly pared them down. Having thoroughly reviewed the victim impact statements given in this case, we find they did not focus too much on the emotional aspects of the decedent's death or her family's life prior to her death. Therefore, the evidence did not violate due process or deprive Appellant of a fair sentencing proceeding.

¶ 92 Appellant's claim that victim impact evidence acts as a "super aggravator" is *res judicata* as the same claim was raised and rejected by this Court in *Mitchell III*, 2006 OK CR 20, ¶ 76, 136 P.3d at 703. We will not consider the issue further.

¶ 93 The uniform jury instruction on victim impact evidence, OUJI–CR (2d) 9–45, states in pertinent part:

The prosecution has introduced what is known as victim impact evidence. This evidence has been introduced to show the financial, emotional, psychological, or physical effects of the victim's death on the members of the victim's immediate family. It is intended to remind you as the sentencer that just as the defendant should be considered as an individual, so too the victim is an individual whose death may represent a unique loss to society and the family.

¶ 94 Appellant initially requested this instruction be given to the jury. Later, Appellant again included the "unique loss to society" language in proposed instructions. However, during the settling of the instructions at the close of evidence, Appellant objected to the term "society" being included in the instruction arguing the term made the instruction broader than the statute which addresses the impact of the crime on the family. The trial court overruled the defense

objection as the instruction given was the uniform instruction.

¶ 95 In his appeal to the first re-sentencing, Appellant raised the same objection to the "loss of society" language. This Court stated in part:

> [V]ictim impact evidence suggesting that a particular victim was a uniquely valuable member of his or her community and our society is not *per se* inadmissible in a capital sentencing proceeding. Furthermore, we conclude that the single reference to the "loss to society" within our uniform jury instruction is constitutional and is also appropriate under Oklahoma law. Hence this portion of Mitchell's victim impact claim is rejected.

2006 OK CR 20, ¶ 80, 136 P.3d at 703–04.

¶ 96 Appellant's current challenge to the instruction is *res judicata* and we will not revisit the issue further.

### Prosecutorial Misconduct

 ¶ 97 Appellant asserts in his fourteenth proposition of error that four areas of prosecutorial misconduct deprived him of a fair sentencing proceeding. In reviewing this claim, we evaluate the alleged misconduct within the context of the entire trial, considering not only the propriety of the prosecutor's actions, but also the strength of the evidence against the defendant and the corresponding arguments of defense counsel. *Hanson,* 2009 OK CR 13, ¶ 18, 206 P.3d at 1028. We are mindful that parties have great latitude in making arguments and drawing inferences from the evidence; we will not grant relief unless a defendant is deprived of a fair trial and is prejudiced by improper argument. *Id.*

██ ¶ 98 Appellant first argues that from *voir dire* through closing argument, the prosecutor improperly equated justice with the death penalty and gave her personal opinion that death was the only just verdict. We review only for plain error as none of the remarks now challenged were met with contemporaneous objections at trial. *Bland,* 2000 OK CR 11, ¶ 89, 4 P.3d at 726.

¶ 99 A review of the comments made in *voir dire* does not support Appellant's argument. None of the comments equate justice with the death penalty or express the prosecutor's personal opinion on the death penalty. At most, the prosecutor got the prospective jurors to agree that the trial should be a search for the truth and that the result should be justice. Other comments suggested that justice might be a sentence other than death. We find no plain error in the prosecutor's *voir dire* comments.

██ ¶ 100 As for closing arguments, the prosecutor's arguments were based on the evidence and focused on the jurors' duty to apply the law and the evidence and return the appropriate verdict. The comments did not convey the message that the jury had to vote for the death penalty or that they were to decide the case based on emotional reaction. *See Moore v. State,* 1987 OK CR 68, ¶ 33, 736 P.2d 161, 167. We find no plain error.

██ ¶ 101 Next, Appellant asserts the State presented testimony of and repeatedly referred to the initial rape charges against Appellant despite this Court's opinion in *Mitchell III* prohibiting such evidence and argument. Appellant admits that some incidents were inadvertent but argues that other instances were purposeful, and regardless, the statements were "particularly prejudicial".

¶ 102 In *Mitchell III*, this Court found "that the evidence at the crime scene is sufficient for the State to argue that Mitchell attempted to rape Scott..." 2006 OK CR 20, ¶ 32, 136 P.3d at 687. Further, this Court concluded that "a completed 'rape' is not a legally permissible inference that the State can argue." *Id.* at n. 82. Therefore, in the second re-sentencing proceeding, evidence that Appellant had attempted to rape the deceased then killed her because she could identify him was properly presented and argued in support of the "avoid lawful arrest" aggravator.

¶ 103 Twice during closing argument, the prosecutor said "rape" instead of "attempted rape." In the first instance, the prosecutor immediately corrected herself. Defense counsel objected, and the trial court admonished the jury that the prosecutor "stumbled

over some of the evidence and incorrectly stated something. Please disregard that part." (Tr. Vol. IX, pgs. 1547–1550).

¶ 104 After the second reference to a "rape," defense counsel objected and the prosecutor told the court it was inadvertent, that she meant to say "attempted rape." The trial court overruled the defense objections and admonished the prosecutor not to do it again. Thereafter, the prosecutor referred to the evidence of the "sexual assault".

¶ 105 The prosecutor's references to rape instead of attempted rape were minimal and appear to be inadvertent. Even if the references were intentional, Appellant has failed to show any prejudice. The improper term was used only twice in a closing argument covering 26 pages of transcript. The evidence was introduced to support the "avoid arrest" aggravator; however the jury did not find that aggravator was supported by the evidence. Appellant has failed to show any resulting prejudice or impact on the sole aggravator found by the jury as the "heinous, atrocious, or cruel" aggravator was supported by sufficient evidence, apart from any reference to a sexual assault. We are not convinced that the prosecutor's improper remarks rendered Appellant's resentencing trial unfair.

¶ 106 Appellant also argues the State introduced needless cumulative evidence about the crime scene and the homicide in an attempt to strengthen the evidence supporting the "heinous, atrocious, or cruel" aggravator. Specifically, Appellant asserts the admission of the photographs and cumulative testimony of Ms. Ross, Capt. Allen and Mr. Bevel went beyond what was necessary for the limited purpose of re-sentencing.

¶ 107 As addressed in Proposition VII, herein, admission of the photographic evidence and presentation to the jury was proper and not needlessly cumulative or unduly prejudicial. In Proposition VIII, herein, we found the crime scene reconstruction testimony of Mr. Bevel relevant and not cumulative. Appellant has not presented any new arguments in this proposition which cause us to reconsider our conclusions. Therefore, the presentation of the evidence and arguments to the jury were not indicative of prosecutorial misconduct. This proposition is denied.

### Aggravating Circumstances

¶ 108 Appellant argues in Proposition X that the trial court erred in instructing the jury on the "continuing threat" aggravator when his prior re-sentencing jury had failed to unanimously find the aggravator beyond a reasonable doubt. We have previously rejected this argument in *Hogan v. State*, 2006 OK CR 19, ¶¶ 52–59, 139 P.3d 907, 926–930 and *Harris v. State*, 2007 OK CR 28, ¶ 13, 164 P.3d 1103, 1110. Appellant's arguments to the contrary are not persuasive.

¶ 109 Further, Appellant's request for relief is unavailing as the jury rejected the "continuing threat" aggravator in this second re-sentencing proceeding finding only the existence of the "heinous, atrocious or cruel" aggravator. As addressed in our mandatory sentence review, sufficient evidence was presented to support the aggravator found by the jury. This proposition is denied.

¶ 110 In Proposition XV, Appellant asserts the "heinous, atrocious, or cruel" aggravator is unconstitutionally vague and overbroad as applied, and that the evidence was insufficient to support the aggravator. The first part of Appellant's argument is *res judicata* as he has previously challenged the constitutionally of the aggravator. In *Mitchell III*, we said:

> In Proposition XIV, Mitchell argues that the "heinous, atrocious, or cruel" aggravating circumstance is "unconstitutionally vague and applied in an overbroad manner." We have repeatedly rejected the claim that this aggravator, as narrowed by this Court, is unconstitutionally vague. In addition, we have recently addressed the argument that this aggravator is "overbroad as applied" and explained that an aggravating circumstance does not become "overbroad" based upon the manner it is applied to particular cases.

2006 OK CR 20, ¶ 104, 136 P.3d at 711.

¶ 111 In challenging the sufficiency of the evidence to support the aggravator, Appellant again argues that certain evidence

was improperly admitted. Specifically he refers to the crime scene reconstruction testimony of Tom Bevel, and the crime scene photographs. We have previously found both the crime scene reconstruction testimony and the crime scene photographs properly admitted. *See* Propositions VII and VIII herein.

¶ 112 Appellant further argues that absent the improperly admitted evidence there is insufficient evidence to support the "heinous, atrocious or cruel" aggravator. This same argument was raised and rejected in *Mitchell III*, wherein this Court found the supporting evidence "simply compelling", noting in 223, "[t]he properly admitted evidence overwhelmingly established 'serious physical abuse' by Mitchell, resulting in 'conscious physical suffering' by Scott". 2006 OK CR 20, ¶ 105, 136 P.3d at 711, n. 223.[18]

¶ 113 On habeas review of the original judgment and sentence, the United States District Court for the Western District found the evidence presented at trial sufficient to support the aggravator stating:

Given the horrific nature of the assault on Ms. Scott prior to her death, including the evidence of struggle which was introduced at trial, there is absolutely no question that the heinous, atrocious and cruel aggravator is well-supported in this case.

150 F.Supp.2d at 1230.

¶ 114 The evidence supporting the aggravator presented at the second re-sentencing appears to be the same as that presented at the first re-sentencing and at the initial trial. The summary of the supporting evidence contained in 54 of the Western District's opinion appropriately summarizes the evidence presented to the jury at the second re-sentencing.

For example: Ms. Scott's clothes were laying beneath a bulletin board which had been knocked off the wall. The phone cord had been yanked from the phone so that the phone would not work. Blood and brain matter were spattered around Ms. Scott's body, down her back, on the door frame and door, and six and one-half to seven feet up the wall. According to the medical examiner, Ms. Scott's brain could be seen on external exam and the "brain was massively torn. There were a lot of wood ... splinters in the wound, in the hair. One of the wood splinters had literally been driven into [sic] the-through the brain and into the internal part of the skull. There was a massive skull fracture which ran across the skull from ear to ear on the inside part of the skull." *Id.* at 878. These wounds were caused by approximately four or five blows with a wooden coat tree. *Id.* at 878–79. Ms. Scott also had a laceration to her scalp which could have been made with a golf club which was found at the scene, broken. *Id.* at 879–80. In addition, Ms. Scott had various abrasions and lacerations to her face, as well as a fractured nose and chipped tooth, all caused by a blunt force such as a blow from the golf club. *Id.* at 880–81. There were also five puncture wounds around Ms. Scott's neck which could have been caused by a compass which was found beneath Ms. Scott's body. *Id.* at pp. 882–83. There were multiple bruises on her arms, left shoulder, knees, pelvic area and legs. *Id.* at 885–86. There were also scratches and abrasions on Ms. Scott's back and buttocks, as well as her fingers. *Id.* Finally, two of Ms. Scott's ribs were fractured. *Id.*

*Id.* at n. 54 (internal citations to the record omitted).

¶ 115 Although the Western District's opinion was ultimately overruled and Appellant's case was eventually sent back for re-sentencing, the finding that the "heinous, atrocious or cruel" aggravator was supported by sufficient evidence has remained unchanged.

 ¶ 116 When the sufficiency of the evidence of an aggravating circumstance is challenged on appeal, this Court reviews the evidence in the light most favorable to the

---

18. While I continue to adhere to the rule that matters contained in footnotes are dicta. *See Cannon v. State*, 1995 OK CR 45, 904 P.2d 89, 108 (Lumpkin, concur in results) citing *Wainwright v. Witt*, 469 U.S. 412, 422, 105 S.Ct. 844, 851, 83 L.Ed.2d 841 (1985), I acknowledge that from time to time there is slippage in the rule.

State to determine if any rational trier of fact could have found the aggravating circumstance beyond a reasonable doubt. *Jones v. State*, 2009 OK CR 1, ¶ 78, 201 P.3d 869, 889. To prove the "especially heinous, atrocious or cruel" aggravator, the State must show that the murder of the victim was preceded by torture or serious physical abuse, which may include the infliction of either great physical anguish or extreme mental cruelty. *Id.* After making the above determination, the attitude of the killer and the pitiless nature of the crime can also be considered. *Id.*

¶ 117 The decedent was first assaulted by Appellant in the Center's library and in a desperate attempt to get away from him, ran for the innermost room of the Center's staff office where she could lock the door behind her and phone for help. However, before she could secure herself behind the locked door, Appellant forced his way into the office and a violent struggle ensued. The decedent's clothing was removed and she was beaten by Appellant using his fist, a school compass, a golf club and a wooden coat rack. The decedent moved and attempted to defend herself throughout the attack until Appellant inflicted the final blow to her head with the coat rack. This evidence clearly shows the decedent's conscious physical suffering as a result of Appellant's repeated physical assaults to her body. Further, her great mental anguish is evident as she surely realized her options for getting past Appellant and out of the office to safety were dwindling.

¶ 118 Considering the unprovoked manner of the killing in this case, the conscious suffering of the decedent, both physically and mentally, and the attitude of the killer as evidenced by Appellant's attacks upon a victim whom he clearly overpowered and who did not have the means to adequately defend herself, the jury's finding of the "heinous, atrocious or cruel" aggravator was supported by sufficient evidence. This proposition is denied.

### Issues Raised in Previous Appeals

¶ 119 In his sixteenth proposition of error, Appellant asks this Court to reconsider its prior rulings on nine different issues, noting that he is raising these claims in order to preserve them for the purpose of further review in any subsequent proceedings.

¶ 120 Appellant first complains that the sentencing phase jury instructions seriously diminished the effect of the mitigating evidence by instructing the jury that evidence in mitigation is that which "may be considered as extenuating or reducing the degree of moral culpability or blame." Appellant asserts this permissive language contained in OUJI–CR (2d) 4–78 improperly allowed the jury the option of ignoring mitigating circumstances altogether.

¶ 121 Having thoroughly reviewed the jury instructions in this case, we do not find any which contain the language now objected to by Appellant. A modified version of 4–78 was given which instructed the jury in part that "mitigating circumstances are those which, in fairness, sympathy and mercy, may extenuate or reduce the degree of moral conduct or blame." (O.R. 1359).

¶ 122 Appellant next complains that Instruction No. 10 (OUJI–CR (2d) 4–76), erroneously implies that a life sentence is appropriate only if the jury failed to find the existence of an aggravating circumstance. This allegation was rejected in *Bryson v. State*, 1994 OK CR 32, ¶ 64, 876 P.2d 240, 262–63. Appellant has not convinced us to revisit the issue.

¶ 123 Appellant next challenges Instruction No. 15 (OUJI–CR (2d) 4–80) instructing the jury how to weigh the mitigating evidence and the aggravating circumstances. Appellant concedes the uniform instruction has been approved by the Court but argues the procedure it provides contravenes the heightened need for reliability in death penalty cases. This claim was raised and rejected in *Welch v. State*, 1998 OK CR 54, ¶¶ 76–77, 968 P.2d 1231, 1250–51 (approving OUJI–CR No. 440, the predecessor to OUJI–CR (2d) 4–80). Appellant has not convinced us to reconsider the issue.

¶ 124 Appellant's challenge to the constitutionality of the death penalty is *res judicata* as this claim was raised and rejected in his first direct appeal. *See Mitchell I*, 1994 OK CR 70, ¶ 47, 884 P.2d at 1203.

¶ 125 Appellant's next three claims, that Oklahoma's death penalty scheme is unconstitutional because it requires special findings of fact, trial court error in overruling his request for an instruction on the presumption of life, and his request for allocution and to argue last were rejected in *Duckett v. State,* 1995 OK CR 61, ¶¶ 54–60, 63, 91, 919 P.2d 7, 20–22, 27. We will not consider these issues further.

¶ 126 Appellant also argues that Oklahoma's use of lethal injection is cruel and unusual punishment. He contends that the protocol leaves discretion with the Warden for decisions surrounding the actual administration of the chemicals, except for the dosage and sites for IVs, the identities of the executioner themselves are kept confidential, there is no "back up plan" should a doctor be unavailable to assist in the execution, and the IV is inserted by the person recruited by the Warden, not specifically a doctor. These same arguments were raised and rejected in *Malicoat v. State,* 2006 OK CR 25, ¶¶ 2–11, 137 P.3d 1234, 1235–39. Appellant offers nothing new to support his claim; therefore, we will not revisit the issue.

¶ 127 Appellant contends the sentencing proceeding was fundamentally flawed because the jury was not instructed that it must find that any aggravating factor[s] must outweigh the mitigating circumstances beyond a reasonable doubt in violation of the Sixth, Eighth and Fourteenth Amendments of the United States Constitution. This argument was rejected in *Torres v. State,* 2002 OK CR 35, ¶¶ 5–7, 58 P.3d 214, 216, and we do so again here.

### Cumulative Error

¶ 128 In Proposition XVII, Appellant contends that even if no individual error merits reversal, the cumulative effect of such errors warrants either reversal of his conviction or a modification of his sentence. A cumulative error argument has no merit when this Court fails to sustain any of the other errors raised by Appellant. *Eizember,* 2007 OK CR 29, ¶ 158, 164 P.3d at 245. However, when there have been numerous irregularities during the course of a trial that tend to prejudice the rights of the defendant, reversal will be required if the cumulative effect of all the errors is to deny the defendant a fair trial. *Id.*

¶ 129 We have reviewed each of Appellant's claims for relief and the record in this case and conclude that although his resentencing trial was not error free, any errors and irregularities, even when considered in the aggregate, do not require relief because they did not render his resentencing trial fundamentally unfair, taint the jury's verdict, or render his sentencing unreliable. Any errors were harmless beyond a reasonable doubt, individually and cumulatively. Therefore, no modification of sentence is warranted and this proposition of error is denied.

### Mandatory Sentence Review

¶ 130 In Proposition XVIII, Appellant contends that sentencing relief is warranted under our mandatory sentence review. Pursuant to 21 O.S.2001, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and (2) whether the evidence supports the jury's finding of the aggravating circumstances as enumerated in 21 O.S.2001, § 701.12. Appellant recognizes our limited considerations under § 701.12, but argues that allegations of error raised previously in this appeal showed his resentencing trial was fundamentally flawed. He further asserts that as he has lived more years on Oklahoma's Death Row than he lived prior to the conviction, there is "no penological justification" for carrying out a death sentence after so many years against a defendant who has twice been found not to be a continuing threat to society.

¶ 131 Each allegation of error raised by Appellant has been thoroughly addressed in this opinion and none have been found to warrant relief. His passage of time complaint also does not warrant relief as the United States Supreme Court has twice declined the opportunity to review Eighth Amendment passage of time claims. *Elledge v. Florida,* 525 U.S. 944, 119 S.Ct. 366, 142 L.Ed.2d 303 (1998) (23 years on death row); *Lackey v. Texas,* 514 U.S. 1045, 115 S.Ct. 1421, 131 L.Ed.2d 304 (1995) (17 years on death row). Further, the fact that two juries

could not unanimously find he was a continuing threat beyond a reasonable doubt does not warrant sentencing relief. In each instance, the "continuing threat" aggravator was not the sole aggravating circumstance alleged and in each instance, the jury found the existence of another aggravator sufficient to support the death penalty.

¶ 132 Turning to the second portion of our mandate under § 701.12, the jury found the existence of the "heinous, atrocious or cruel" aggravating circumstance. *See* 21 O.S.2001, § 701.12(4). As discussed in Proposition XV, this aggravator was supported by sufficient evidence.

¶ 133 Appellant presented twenty-four witnesses in mitigation. These witnesses testified generally that Appellant had just turned 18 years old at the time of the homicide; Appellant grew up in poverty in a high crime and violent neighborhood and in a house shared by many other siblings and family members; his father drew disability; his mother received Aid to Families with Dependent Children; his parents drank during his early developmental years; one of his teachers believed that his parents neglected Appellant and his siblings; his mother and father would often have violent physical fights in front of Appellant and his siblings and it would make him feel helpless and scared; his growth years were marred by a dysfunctional family where physical, emotional, and verbal abuse were common along with the abuse of alcohol; Appellant's low income and violent neighborhood contributed to the amount of violence he was exposed to and had a negative impact on his growth; exposure to domestic violence in his home had a very negative impact on Appellant's development and later manifested in violent outbursts toward others; Appellant was sexually molested as a child and the effect had a negative impact on his growth and development; at Rader juvenile center, Appellant expressed concerns to staff about his anger and problems controlling it and even though he had made little progress, and his prognosis was not good, he was released at 18 instead of being held for another year until his 19th birthday; he has been in prison for more than 15 years and has never received a misconduct or disciplinary report of any kind; Appellant's behavior in prison demonstrates that he has the strength of character to live a peaceful, productive life within the structured environment of a prison; the Department of Corrections has no record that Appellant has ever been threatening or caused harm to anyone while in the Department of Corrections; after more than 16 years since the crime, Appellant is an older and more mature person that he was in 1991 at the time of the homicide; Appellant has family and friends who love and care for him and his life has meaning and significance to them; Appellant cares about his family and sends them cards and letters and tries to encourage family members to better themselves and stay out of trouble; and Appellant has been and is a positive influence on the younger members of his family. This evidence was summarized and presented to the jury in Instruction No. 14 along with any other mitigating evidence the jury might find existed.

¶ 134 Upon our review of the record and careful weighing of the aggravating circumstance and the mitigating evidence, we find the sentence of death to be factually substantiated and appropriate.[19] Based upon the record before this Court, we cannot say the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.2001, § 701.13(C), in finding that the aggravating circumstance outweighed the mitigating evidence. Accordingly, we find no error warranting sentence modification

## DECISION

¶ 135 The **SENTENCE** of death is AFFIRMED. Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2010), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

CHAPEL, J.: not participating.[20]

C. JOHNSON, P.J. and LEWIS, J. and

---

**19.** This fact is further substantiated through the verdicts of three separate juries over a span of fifteen (15) years, each determining that death was the appropriate sentence for this crime.

**20.** While Judge Chapel was present for the Oral

TAYLOR, S.J.[21]: concur.

Argument in this case on December 8, 2009, he retired from the Court on March 1, 2010, and is not participating in the final decision in this case.

21. The Honorable Steven W. Taylor, sitting by assignment in lieu of Judge Arlene Johnson, who recused.